[No. G043054. Fourth Dist., Div. Three. Apr. 13, 2011.]

LINDA WILLS, Plaintiff and Appellant, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Defendant and
Respondent.

## COUNSEL

Spillane Weingarten, Alex M. Weingarten; and Joshua R. Furman for Plaintiff and Appellant.

Claudia Center for The Legal Aid Society—Employment Law Center as Amicus Curiae on behalf of Plaintiff and Appellant.

Paul, Plevin, Sullivan & Connaughton, Fred M. Plevin and Michael J. Etchepare for Defendant and Respondent.

Jones Day, George S. Howard, Jr., and Kristine S. Tremble for Employers Group, California Employment Law Council and California State Association of Counties as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**ARONSON, J.**—Plaintiff Linda Wills appeals from the judgment entered after the trial court granted a summary judgment motion by defendant Superior Court of the State of California, County of Orange (OC Court). Wills worked for the OC Court until it terminated her employment for violating its written policy against verbal threats, threatening conduct, and violence in the workplace. Wills sued the OC Court, alleging it terminated her for conduct related to her mental disability. Wills argued the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.) prohibits an employer from terminating or disciplining an employee for workplace misconduct caused by a disability in the same manner as it prevents an employer from discriminating against an employee for having a disability.

The trial court granted the OC Court's summary judgment motion on the grounds that (1) Wills failed to exhaust her administrative remedies on the six FEHA causes of action relating to discrimination and harassment she alleged in her operative pleading and (2) Wills's misconduct provided a legitimate, nondiscriminatory basis for terminating her employment. We agree Wills failed to exhaust her administrative remedies as to five of her six causes of action, and the remaining cause of action fails because Wills's misconduct provided a legitimate, nondiscriminatory reason for her termination. Specifically, Wills's disability discrimination claim fails because an employer may reasonably distinguish between disability-caused misconduct and the disability itself when the misconduct includes threats or violence against coworkers. In these circumstances, terminating the employee based on the misconduct

does not amount to discrimination prohibited by FEHA. Consequently, we affirm the trial court's judgment.

## I

### FACTS AND PROCEDURAL HISTORY

Wills's doctor diagnosed her with bipolar disorder in 1997. Bipolar disorder is a mental disability characterized by mood swings between depressive and manic episodes. Persons experiencing a manic episode may become irritable, verbally and physically aggressive, and loud. Inappropriate behavior also can occur, including blurting out socially inappropriate and even threatening comments. A manic episode also may produce difficulty in controlling impulses and temperament. Grandiose thinking and increased self-esteem often accompany these other symptoms. Persons suffering a manic episode commonly will not recall clearly what they did or thought during the episode.

Psychiatric care and medication aid in controlling bipolar disorders, but manic and depressive episodes may still occur. Persons experiencing a manic episode sometimes require new or adjusted medication and may require hospitalization to treat the chemical imbalances causing the episode or to separate them from any triggering stimulus in their environment. When the condition is properly managed, individuals can have extended periods without either a manic or depressive episode.

Wills began working for the OC Court in 1999 as a court processing specialist, and later became a court clerk. During Wills's employment, she took numerous medical leaves to treat her bipolar disorder, but neither she nor her doctor informed the OC Court why Wills needed the time off. Wills, however, did tell some of her supervisors she suffered from depression.

In early July 2007, the OC Court assigned Wills to the Anaheim Police Department's lockup facility to help arraign criminal suspects by video. On July 3, Wills arrived for work and rang the buzzer for entry into the secured facility. She waited outside for several minutes before being admitted.

When she entered the lockup area, Wills angrily swore and yelled at Anaheim Police Department employees, accusing them of intentionally leaving her outside in the summer heat. Wills told Officer Todd Gardetto she added him and detention facility assistant Michelle Nellesen to her "Kill Bill" list for leaving her out in the heat. Gardetto and Nellesen both felt threatened by Wills's demeanor and statements. They understood the "Kill Bill" list comment to refer to a movie in which the main character made a list of people she intended to kill.

Although Wills did not make the "Kill Bill" comment directly to Nellesen, Gardetto informed Nellesen about the comment shortly after Wills made it. Moreover, Wills angrily told Nellesen never to leave her outside again. In reporting the matter to her supervisor, Nellesen asked if she should seek a restraining order against Wills. Other employees who witnessed Wills's outburst also viewed it as threatening Gardetto and Nellesen.

Despite Wills's conduct, the Anaheim Police Department permitted her to complete her shift. But the department reported the incident to the OC Court, and demanded the OC Court never again assign Wills to its facility. The OC Court agreed to the department's demand.

At her deposition, Wills disputed the events and circumstances surrounding the "Kill Bill" comment. She denied threatening to put anyone on a "Kill Bill" list. According to Wills, she and Gardetto were joking during some downtime an hour or more after she entered the facility. Wills testified she asked Gardetto if he knew about the "Kill Bill" movie and what would happen if she put him and Nellesen on a "Kill Bill" list. Wills explained she asked the question as a joke and Gardetto laughed in response.

Wills was unaware of it at the time, but these events occurred during the early stages of a severe manic episode. A few days later, Wills's doctor placed her on medical leave to treat her manic episode.

While out on leave, Wills forwarded a cell phone ringtone to several people, including a coworker. The ringtone's video portion showed the character Buckwheat from *The Little Rascals* television show. Its audio portion repeatedly commanded the recipient to check his or her messages. The commands grew in anger and volume, culminating in a shrieking directive: " 'I'm going to blow this bitch up if you don't check your messages right now! . . . Fuck you!' " The coworker who received the ringtone reported it to the OC Court, complaining the ringtone's tenor and content disturbed and frightened her. The coworker explained she felt the threats were directed to her because she had an uneasy relationship with Wills.

Also while out on leave, Wills sent numerous e-mail messages to friends and family members and to several coworkers at e-mail addresses the OC Court provided. The e-mails rambled wildly as Wills vented a wide array of thoughts and emotions. Wills expressed extreme anger at certain family members, disowning them and vowing never to see or speak with them again. She also expressed love and gratitude toward other family members and friends who continued to support her. The desultory e-mails covered topics ranging from her conversations with God to trips she planned to take. In the e-mails, Wills acknowledged their sometimes disturbing and threatening tone, but explained everything nonetheless needed to be said.

One coworker reported the e-mails to the OC Court, complaining that Wills's angry and irrational tone, and Wills's references to violence, alarmed her. The coworker believed Wills directed some of the threats to her based on the following statements: (1) "I say that because I'm covering my ass, just in case one of you evil bitches feel like punishing me again by calling the police or showing them my numerous 'so called hate' emails" and (2) "BUT GOD TOLD ME, 'DON'T WORRY LINDA, YOUR FAMILY AND SO CALLED FRIENDS WILL PAY FOR WHAT THEY PUT YOU THROUGH THIS WHOLE TAXING WEEK, AND GET THEM OUT OF YOUR MIND BECAUSE THEY ARE NOT WORTH YOU[R] PAIN AND SUFFERING ANYMORE. DO ANYTHING YOUR PRECIOUS HEART DESIRES, BE-CAUSE I, GOD WILL NOW PROTECT YOU FROM EVIL AND THE DEMONS THAT CAME OUT IN YOUR FAMILY AND FRIENDS. THEY WILL PAY FOR WHAT THEY DID TO YOU.['] " The coworker thought the references to " 'evil bitches' " and " 'so-called family and friends' " referred to her. The coworker explained that several days before receiving the e-mails, Wills called her in a distraught state and talked about suicide. The coworker told Wills she was going to call 911 to get Wills help.

Several weeks later, Wills's manic episode ended and her doctor cleared her to return to work without restrictions. On the day of her scheduled return, however, the OC Court placed Wills on paid administrative leave to investigate the incident at the Anaheim Police Department and the complaints regarding the ringtone and e-mail messages. During this investigation, Wills's doctor submitted a letter to the OC Court explaining Wills suffered from bipolar disorder that caused her behavior in these incidents. Wills's doctor further explained Wills at no time posed a danger to anyone.

During its investigation, the OC Court interviewed Wills, who initially denied making any comment about placing Gardetto and Nellesen on a "Kill Bill" list, but later stated she intended the comment as a joke. Wills also characterized the ringtone as a joke and claimed she did not recall what she said in the e-mails or to whom she sent them.

After completing its investigation, the OC Court decided to terminate Wills's employment. In October 2007, the OC Court sent Wills a termination notice identifying the following grounds: "1. Threatening a peace officer and other Anaheim Police Department personnel with physical harm while conducting official Court business. [¶] 2. Threatening and inappropriate communications with co-workers. [¶] 3. Misuse of Court Resources. [¶] 4. Poor Judgment." The OC Court explained Wills's conduct violated its employee handbook provisions prohibiting verbal threats, threatening behavior, and violence. The OC Court also concluded that Wills's behavior and her efforts to minimize her conduct as a joke demonstrated poor judgment.

Wills responded with a letter asserting the OC Court unlawfully discriminated against her based upon her mental disability. She explained her bipolar disorder caused the behavior cited as the basis for her termination, and the conduct occurred while she experienced a severe manic episode. Wills further alleged a group of coworkers triggered her manic episode by harassing her. Finally, Wills asserted the OC Court fired her in retaliation for complaining to her supervisors about the harassment.

After receiving Wills's letter, the OC Court delayed her termination and hired an independent investigator to explore her harassment claims. Wills based her allegations on a coworker's comment Wills perceived as a threat to assault her. Wills told the investigator she shared an elevator with four coworkers with whom she did not get along and who intimidated her. As Wills's friend rushed to catch the elevator, Wills joked she would not hold the elevator for her friend. When Wills's friend reached the elevator, one coworker told her, " 'We won't say anything if you want to beat [Wills] up.' " Wills felt uncomfortable and intimidated because she construed the coworker's remark as an implicit threat to beat her up. After questioning the witnesses, the investigator concluded the comment did not amount to a credible threat of physical harm, but nonetheless was offensive and inappropriate.

In January 2008, after considering Wills's response to the termination notice and the investigator's report regarding the harassment allegations, the OC Court terminated Wills's employment. Wills thereafter filed a discrimination complaint with the Department of Fair Employment and Housing (DFEH) asserting the OC Court violated FEHA. After obtaining a right-to-sue notice from DFEH, Wills filed this action. Wills's operative first amended complaint alleged six FEHA causes of action for disability discrimination, retaliation, hostile work environment, failure to prevent harassment, failure to engage in the interactive process, and failure to make reasonable accommodations.

The OC Court moved for summary judgment arguing (1) Wills failed to exhaust her administrative remedies as to her six FEHA causes of action, and (2) Wills could not otherwise establish an essential element of each cause of action. The trial court agreed and granted the OC Court's motion. The court found Wills failed to exhaust her administrative remedies with DFEH because her administrative complaint referred only to discrimination based on the denial of family or medical leave, but omitted the disability discrimination and harassment claims she later alleged in her judicial complaint. In the alternative, the trial court found Wills's FEHA claims failed as a matter of law because the OC Court terminated her employment for a legitimate,

nondiscriminatory reason—Wills violated the OC Court's written policies prohibiting threats and violence in the workplace.[1] This appeal followed.

## II

### DISCUSSION

Wills advances two main arguments to overturn the judgment. First, she contends the exhaustion of administrative remedies doctrine did not require her to use any particular words in the administrative complaint she filed with DFEH. Wills argues she satisfied the exhaustion requirement because a reasonable investigation of the allegations in her administrative complaint would have uncovered the discrimination and harassment claims she later alleged in her judicial complaint. Second, Wills argues the OC Court improperly terminated her based on conduct caused by her mental disability because FEHA treats disability-caused misconduct as part of the disability. Wills contends a termination based on that conduct violates FEHA in the same manner as termination based on the disability itself.

### A. Exhaustion of Administrative Remedies

Before filing a civil action alleging FEHA violations, an employee must exhaust his or her administrative remedies with DFEH. Specifically, the employee must file an administrative complaint with DFEH identifying the conduct alleged to violate FEHA. At the conclusion of the administrative process, which may or may not include an investigation or administrative remedies, DFEH generally issues the employee a right-to-sue notice. (*Medix Ambulance Service, Inc. v. Superior Court* (2002) 97 Cal.App.4th 109, 116 [118 Cal.Rptr.2d 249].)

The OC Court does not dispute Wills timely filed an administrative complaint with DFEH and obtained a right-to-sue notice. "The question is whether [Wills] can maintain the instant action for alleged incidents of discrimination [retaliation, harassment, and failure to accommodate] which were not specifically enumerated in [her] complaint before the DFEH." (*Baker v. Children's Hospital Medical Center* (1989) 209 Cal.App.3d 1057, 1062 [257 Cal.Rptr. 768].)

Wills's DFEH complaint marked the box for discrimination based on "denial of family/medical leave" only. Her complaint did not mention disability discrimination, retaliation, harassment, or failure to accommodate a

---

[1] The trial court's alternative ground focused on the disability discrimination claim, but failed to clearly address the other causes of action on any grounds other than the exhaustion of administrative remedies. Nonetheless, this ambiguity does not affect our conclusion regarding the exhaustion of administrative remedies issue and the disability discrimination claim.

disability. Instead, the complaint alleged the OC Court discriminated against Wills by refusing to reinstate her following her medical leave of absence. Although filed after the OC Court terminated Wills, her DFEH complaint did not mention her termination.

Upon receiving the administrative complaint, DFEH forwarded a copy to the OC Court. (See Gov. Code, § 12962.) The OC Court responded to DFEH by letter, explaining Wills's discrimination claim based on denial of family or medical leave lacked merit because the OC Court granted all her leave requests. The letter also explained in detail the OC Court's reasons for terminating Wills and why her termination did not constitute disability discrimination. Finally, the letter explained the OC Court "drafted [it] as though Ms. Wills has claimed either disability discrimination or retaliation based on a protected leave, even though neither is directly indicated by Ms. Wills on her complaint form."

Unlike her DFEH complaint, Wills's judicial complaint did not allege denial of family or medical leave. Instead, the judicial complaint alleged six causes of action for FEHA violations based on disability discrimination and harassment.

The trial court granted the OC Court's summary judgment motion on the ground Wills failed to exhaust her administrative remedies on all six causes of action. The court explained Wills's "claim to DFEH made no mention of disability discrimination or hostile work environment but limited itself to denial of leave under the [Family and Medical Leave Act]." The trial court acknowledged the OC Court's letter to DFEH discussed Wills's claim for disability discrimination, but found that to be an insufficient basis to satisfy the exhaustion requirement because "mere pre-emptive discussion of disability discrimination by [the OC Court] cannot be deemed a waiver of formal procedural requirements."

█ Recently, in *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243 [100 Cal.Rptr.3d 296] (*Nazir*), the Court of Appeal discussed the permissible scope of a civil action for FEHA violations. Specifically, the *Nazir* court adopted the following standard used to determine the permissible scope for civil actions under title VII of the federal Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) after an employee files an administrative complaint with the federal Equal Employment Opportunity Commission (EEOC): " 'The administrative exhaustion requirement is satisfied if the allegations of the civil action are within the scope of the EEOC charge, any EEOC investigation actually completed, or any investigation that might reasonably have been expected to grow out of the charge. Thus, the judicial complaint may encompass any discrimination "like and reasonably related to" the allegations

of the EEOC charge.' " (*Nazir*, at pp. 266–267, italics omitted, quoting Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2010) ¶ 16:195 et seq., p. 16-30 (rev. # 1, 2010).)

The *Nazir* court also explained the importance, under this standard, of information obtained through an administrative investigation, rather than from merely examining the administrative complaint: " ' "[T]he 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. [¶] The logic of this rule is inherent in the statutory scheme of Title VII. A charge of discrimination is *not* filed as a preliminary to a lawsuit. On the contrary, the purpose of a charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC. Once a charge has been filed, [the EEOC] carries out its investigatory function and attempts to obtain voluntary compliance with the law. Only if the EEOC *fails* to achieve voluntary compliance will the matter ever become the subject of court action. Thus it is obvious that the civil action is much more intimately related to the EEOC investigation than to the words of the charge which originally triggered the investigation." ' [Citation.]" (*Nazir, supra*, 178 Cal.App.4th at pp. 267–268, original italics.)

In *Nazir*, the defendant obtained summary adjudication on a FEHA harassment claim because the plaintiff failed to exhaust his administrative remedies. The Court of Appeal reversed, reasoning DFEH's administrative investigation revealed facts absent from the administrative complaint that supported the plaintiff's harassment claim. (*Nazir, supra*, 178 Cal.App.4th at pp. 268–269.) In particular, before filing his administrative complaint, the plaintiff submitted two questionnaires to DFEH making numerous references to workplace harassment. (*Id.* at pp. 264–265, 268–269.) Moreover, after filing his administrative complaint, the plaintiff sent the DFEH investigator an eight-page letter detailing the harassment. (*Id.* at pp. 265, 268–269.) Because these documents describing the harassment came to DFEH's attention during its administrative investigation, the *Nazir* court reversed the trial court's ruling, explaining "what is submitted to the DFEH must not only be construed liberally in favor of plaintiff, it must be construed in light of what might be uncovered by a reasonable investigation." (*Id.* at p. 268.)

Here, the question arises whether the trial court gave appropriate significance to the information disclosed to DFEH during the administrative process, specifically, the facts discussed in the OC Court's letter regarding Wills's disability discrimination claim. Wills contends an analogy may be drawn between the plaintiff's letter to DFEH in *Nazir* and the OC Court's letter to DFEH because both letters disclosed facts and claims not mentioned in the administrative complaints. According to Wills, the OC Court's letter

demonstrates it knew Wills claimed that discharging her for disability-caused misconduct equated to terminating her for having a disability.

■ *Nazir* tied a civil action's permissible scope to the information brought to DFEH's attention when it conducts an administrative investigation, or to information DFEH reasonably should have discovered during its investigation. (*Nazir, supra,* 178 Cal.App.4th at pp. 266–267.) *Nazir*'s broad language did not account for who brings the information to DFEH's attention. Rather, *Nazir* focused on whether the information did, or reasonably should have, come to DFEH's attention regardless of the information's source. We note, however, *Nazir* involved information in a letter sent by the employee *asserting* a discrimination claim, but here the employer sent a letter to DFEH *defending* itself against potential claims. (See *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1097 [95 Cal.Rptr.2d 198, 997 P.2d 511] ["language of an opinion must be construed with reference to the facts presented by the case; the positive authority of a decision is coextensive only with such facts"]; *Silverbrand v. County of Los Angeles* (2009) 46 Cal.4th 106, 127 [92 Cal.Rptr.3d 595, 205 P.3d 1047] [" ' "[i]t is axiomatic that cases are not authority for propositions not considered" ' "].)

The purpose of FEHA's administrative exhaustion requirement is to ensure DFEH is provided the opportunity to resolve disputes and eliminate unlawful employment practices through conciliation. (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 83 [276 Cal.Rptr. 130, 801 P.2d 373] ["the exhaustion requirement serves the important policy interests embodied in the act of resolving disputes and eliminating unlawful employment practices by conciliation [citation], as well as the salutory goals of easing the burden on the court system, maximizing the use of administrative agency expertise and capability to order and monitor corrective measures, and providing a more economical and less formal means of resolving the dispute [citation]"].) Wills asserts that purpose is served by finding the exhaustion requirement satisfied when information an employer provides to DFEH may suggest a potential claim. But a rule permitting an employee to satisfy the exhaustion requirement based on information the employer voluntarily provided on an uncharged claim may discourage employers from providing a comprehensive response to DFEH's investigation, thereby undermining DFEH's ability to investigate unlawful employment practices.

These issues, however, must await another day for our consideration. For purposes of this opinion, we need not decide whether Wills may rely on the OC Court's letter to DFEH to satisfy the administrative exhaustion requirement. We may assume Wills exhausted her administrative remedies on her first cause of action for disability discrimination because, as explained below, we affirm the trial court's alternative ruling that the claim lacked merit. As to

Wills's second through sixth causes of action, we conclude she failed to exhaust her administrative remedies, even if we considered the OC Court's letter.

Wills's second cause of action alleged the OC Court terminated her in retaliation for complaining about coworker harassment. Wills failed to point to any evidence showing this claim came to light in the administrative process, or that DFEH should have discovered the basis for this claim. Neither Wills's administrative complaint nor the OC Court's letter mentioned that Wills's coworkers harassed her, let alone that the OC Court retaliated against Wills for complaining about the harassment. Although the OC Court's letter made passing reference to Wills's belief the OC Court retaliated against her for requesting medical leave, that constitutes a distinct and separate allegation from the retaliation claimed in her second cause of action and therefore does not show Wills exhausted her administrative remedies. (Cf. *Okoli v. Lockheed Technical Operations Co.* (1995) 36 Cal.App.4th 1607, 1615 [43 Cal.Rptr.2d 57] [" 'a complaint alleging race discrimination is neither "like or related to" nor likely to be discovered in a "reasonable" investigation of a charge of sex discrimination' "].)

Wills's third and fourth causes of action were for hostile work environment and failure to prevent workplace harassment. Similar to the second cause of action, these claims alleged coworkers harassed Wills and the OC Court did nothing to prevent the harassment. Wills again failed to point to any evidence showing this harassment claim surfaced in the administrative process. As stated above, neither Wills's administrative complaint nor the OC Court's letter mentioned harassment. A claim the OC Court discriminated against Wills by firing her based on her mental disability is distinct and different in nature from a claim Wills's coworkers harassed her during her employment, especially given the lack of any evidence her coworkers harassed Wills based on her disability. (See *Yurick v. Superior Court* (1989) 209 Cal.App.3d 1116, 1123 [257 Cal.Rptr. 665] [DFEH complaint for gender discrimination did not exhaust administrative remedies on claim for age harassment].)

The fifth and sixth causes of action alleged the OC Court failed to engage in the interactive process to determine a reasonable accommodation and failed to make reasonable accommodations for Wills's mental disability. Wills, however, failed to present any evidence showing these claims surfaced in the administrative process or explain how these claims should have been discovered during a reasonable investigation. Neither Wills's administrative complaint nor the OC Court's letter to DFEH mentioned a failure to accommodate Wills's disability.

Although a claim for failure to accommodate might surface when DFEH investigates a discrimination claim based on that same disability, the facts

here show Wills did not raise an accommodation claim. Investigation of Wills's disability discrimination claim revealed the OC Court terminated her for misconduct, not for an inability to perform her job because of her disability. Wills asked the OC Court to excuse her misconduct because of her disability, not for an accommodation to enable her to perform her job. " 'Reasonable accommodation' does not include excusing a failure to control a controllable disability or giving an employee a 'second chance' to control the disability in the future. [Citation.]" (*Brundage v. Hahn* (1997) 57 Cal.App.4th 228, 239 [66 Cal.Rptr.2d 830] (*Brundage*).)

Wills insists she exhausted her administrative remedies on all causes of action because she informed the DFEH interviewer she wanted to make a claim for disability discrimination. This contention fails for two reasons. First, Wills's verbal notice to DFEH she wanted to pursue a disability discrimination claim failed to demonstrate she exhausted her administrative remedies on her other causes of action.

Second, oral statements made to DFEH before filing an administrative complaint are not sufficient to exhaust administrative remedies. (*Cole v. Antelope Valley Union High School Dist.* (1996) 47 Cal.App.4th 1505, 1515 [55 Cal.Rptr.2d 443] (*Cole*) ["Moreover, it would not be practical to allow an employee to substitute unverified information relayed to the DFEH in correspondence, or orally, for a formal administrative charge."]; *Rodriguez v. Airborne Express* (9th Cir. 2001) 265 F.3d 890, 897 (*Rodriguez*) ["This circuit has previously refused to consider oral statements conveyed to a DFEH investigator to determine the scope of a reasonable investigation. [Citation.] Moreover, a California court has held that neither unverified written nor oral information relayed to DFEH may substitute for a formal administrative charge."].)

Wills contends *Nazir* supports the contrary conclusion, but *Nazir* did not involve oral statements made to DFEH either before or after the plaintiff filed the administrative complaint. In finding the employee exhausted his administrative remedies, the *Nazir* court relied on the detailed *written* materials the employee submitted to DFEH both before and after filing the administrative complaint. The court found those written materials created a triable issue on whether DFEH's investigation would have uncovered the new cause of action. (*Nazir, supra,* 178 Cal.App.4th at pp. 268–269.) Here, other than her initial complaint, there is no evidence Wills submitted any written materials to DFEH, let alone detailed materials similar to those the employee in *Nazir* submitted.

In a related argument, Wills asserts she satisfied the exhaustion requirement because she told DFEH about her discrimination claim and DFEH failed to

include it in her administrative complaint. The courts in *Cole* and *Rodriguez* rejected an identical argument. (*Cole, supra,* 47 Cal.App.4th at p. 1515; *Rodriguez, supra,* 265 F.3d at p. 897.) *Rodriguez* acknowledged an equitable exception to the exhaustion requirement when DFEH misleads the employee regarding the administrative complaint's content. (265 F.3d at pp. 900–902.) Wills, however, does not argue DFEH representatives misled her. To the contrary, DFEH actually informed Wills she had to file a second administrative complaint to pursue her disability discrimination claim, but Wills failed to do so.

In sum, we assume, without deciding, that Wills exhausted her administrative remedies as to her first cause of action, and conclude she failed to exhaust her administrative remedies on her second through sixth causes of action.

### B. *Disability Discrimination*

#### 1. *General Principles on FEHA Discrimination Claims*

■ FEHA protects employees from discrimination based on a wide variety of grounds. (Gov. Code, § 12940.) As relevant to this action, those grounds include discrimination based on mental disability, and bipolar disorder in particular. (Gov. Code, §§ 12940, 12926.1, subd. (c).)

■ Due to "the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes. [Citation.] In particular, California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination . . . ." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 [100 Cal.Rptr.2d 352, 8 P.3d 1089] (*Guz*).)

"This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz, supra,* 24 Cal.4th at p. 354.)

■ In the first stage, the plaintiff bears the burden to establish a prima facie case of discrimination. (*Guz, supra,* 24 Cal.4th at p. 354.) The burden in this stage is " 'not onerous' " (*id.* at p. 355), and the evidence necessary to satisfy it is minimal (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 310 [115 Cal.Rptr.3d 453] (*Sandell*)). On a disability discrimination claim, the prima facie case requires the plaintiff to show "he or she (1) suffered

from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations, and (3) was subjected to an adverse employment action because of the disability or perceived disability." (*Ibid.*)

If the plaintiff meets this burden, " ' "the burden shifts to the defendant to [articulate a] legitimate nondiscriminatory reason for its employment decision. . . ." . . .' " (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 342–343 [77 Cal.Rptr.3d 654], original alteration (*Arteaga*).) This likewise is not an onerous burden (*Board of Trustees v. Sweeney* (1978) 439 U.S. 24, 25, fn. 2 [58 L.Ed.2d 216, 99 S.Ct. 295]), and is generally met by presenting admissible evidence showing the defendant's reason for its employment decision (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1004 [93 Cal.Rptr.3d 338] (*Scotch*)).

Finally, if the defendant presents evidence showing a legitimate, nondiscriminatory reason, the burden again shifts to the plaintiff to establish the defendant intentionally discriminated against him or her. (*Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 142 [147 L.Ed.2d 105, 120 S.Ct. 2097] (*Reeves*).) The plaintiff may satisfy this burden by proving the legitimate reasons offered by the defendant were false, creating an inference that those reasons served as a pretext for discrimination. (*Ibid.*)

■ A defendant's summary judgment motion " 'slightly modifies the order of these [*McDonnell Douglas*] showings.' " (*Scotch, supra*, 173 Cal.App.4th at p. 1005.) Consequently, the OC Court had the initial burden to either (1) negate an essential element of Wills's prima facie case (*Arteaga, supra*, 163 Cal.App.4th at p. 344) or (2) establish a legitimate, nondiscriminatory reason for terminating Wills (*Scotch*, at p. 1005).

"[T]o avoid summary judgment [once the employer makes the foregoing showing], an employee claiming discrimination must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004–1005 [67 Cal.Rptr.2d 483] (*Hersant*).)

"As several federal courts have stated: 'The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. [Citations.] . . .' " (*Hersant, supra*, 57 Cal.App.4th at p. 1005.)

We review the trial court's decision to grant summary judgment de novo. We are not bound by the trial court's stated rationale, but independently determine whether the record supports the trial court's conclusion that plaintiff's discrimination claim failed as a matter of law. (*Scotch, supra,* 173 Cal.App.4th at p. 1003.)

2. *Adverse Employment Action Based on Disability-caused Misconduct*

There is no dispute Wills's bipolar disorder prompted the behavior the OC Court cited in her termination notice, and that the OC Court learned about Wills's mental disability before making the decision to discharge her. To resolve Wills's discrimination claim, we must determine whether OC Court's termination of Wills based on her disability-caused misconduct violated FEHA, using the analytical framework established by *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [36 L.Ed.2d 668, 93 S.Ct. 1817] (*McDonnell Douglas*).

Wills contends all conduct resulting from a disability is considered part of the disability, rather than a separate basis for termination. According to Wills, she established a FEHA violation by showing her mental disability caused the behavior that led to her discharge and the OC Court knew about her disability before ending her employment. For its part, the OC Court argues Wills's FEHA discrimination claim fails because the OC Court is entitled to terminate an employee who violates its written policy against workplace threats and violence, even if a disability caused the misconduct.

Because no reported California case addresses whether FEHA equates disability-caused misconduct with the disability itself, Wills, the OC Court, and amicus curiae cite numerous federal cases decided under the Americans with Disabilities Act of 1990 (ADA; 42 U.S.C. § 12101 et seq.) and the Rehabilitation Act of 1973 (29 U.S.C. § 701 et seq.). "Inasmuch as the FEHA and the interpretative regulations in California Code of Regulations were modeled on [these federal laws], decisions interpreting those laws may be useful in deciding cases under the FEHA." (*Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 948 [62 Cal.Rptr.2d 142].)

Wills relies principally on three Ninth Circuit decisions, holding " 'conduct resulting from a disability is considered part of the disability, rather than a separate basis for termination.' " (*Gambini v. Total Renal Care, Inc.* (9th Cir. 2007) 486 F.3d 1087, 1093 (*Gambini*); see *Dark v. Curry County* (9th Cir. 2006) 451 F.3d 1078, 1084 (*Dark*); *Humphrey v. Memorial Hospitals Assn.* (9th Cir. 2001) 239 F.3d 1128, 1139 (*Humphrey*).)

These cases, however, fail to provide any analysis to support their conclusion equating disability-caused misconduct with the disability itself. *Gambini*

and *Dark* merely cite *Humphrey*, and state its conclusion without any discussion why the ADA treats a disability and disability-caused misconduct as one and the same. Similarly, *Humphrey* merely cites a Tenth Circuit decision—*Den Hartog v. Wasatch Academy* (10th Cir. 1997) 129 F.3d 1076, 1086 (*Den Hartog*)—without analyzing the issue.

In *Den Hartog*, the employer acknowledged the ADA prohibited discrimination based on a disability, but argued for a bright-line rule permitting employers to discipline or discharge employees for disability-caused misconduct. (*Den Hartog, supra*, 129 F.3d at pp. 1085–1086.) *Den Hartog* rejected that argument, holding the ADA does not contemplate "a stark dichotomy between 'disability' and 'disability-caused misconduct.' " (129 F.3d at p. 1088.) *Den Hartog* nonetheless acknowledged the ADA *does* expressly authorize an employer to distinguish between a disability and misconduct caused by the disability when the disability is alcoholism or drug use.[2] Because that is the only instance in which the ADA expressly authorizes a distinction between a disability and disability-caused misconduct, the *Den Hartog* court concluded Congress implicitly rejected a bright-line rule allowing employers to make that distinction for all disabilities. (129 F.3d at p. 1086.)

Without analysis, *Humphrey* turns *Den Hartog* on its head and cites it for a bright-line proposition it did not decide: that disability-caused misconduct is always protected as part of the disability itself. *Den Hartog*, however, never made such a sweeping claim. To the contrary, it implicitly rejected that conclusion by acknowledging the "general rule" that an employer may hold a disabled employee to precisely the same standards of conduct as a nondisabled employee if the standards are job related and consistent with business necessity. (*Den Hartog, supra*, 129 F.3d at p. 1086.) In acknowledging this "general rule," *Den Hartog* cited an EEOC interpretation of the ADA concluding nothing in the ADA prevented an employer from disciplining an employee for threats or violence in the workplace. (EEOC, Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities (Mar. 25, 1997) question 30 <http://www.eeoc.gov/policy/docs/psych.html> [as of Apr. 13, 2011].) The *Den Hartog* court also acknowledged "there are certain levels of disability-caused conduct that need not be tolerated or accommodated by employers."[3] (129 F.3d at p. 1087.)

---

[2] Specifically, an employer " 'may hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the alcoholism or drug use of such employee.' " (*Den Hartog, supra*, 129 F.3d at p. 1086, quoting 42 U.S.C. § 12114(c)(4).)

[3] We note *Den Hartog* appears to be internally inconsistent. It begins its analysis with the categorical statement that employers may not distinguish between disability-caused conduct

Although the cases Wills cites generally prohibit a distinction between disability-caused misconduct and the disability itself, none considered how to address disability-caused misconduct involving threats or violence against coworkers. Wills argues *Gambini* involved threats against coworkers, but a close reading of that case reveals otherwise.

The plaintiff in *Gambini* suffered from bipolar disorder, which affected her job performance. Her supervisors developed an improvement plan and discussed it with the plaintiff. After reading the plan, the plaintiff threw it back across her supervisor's desk, and used "a flourish of several profanities [to] express[] her opinion [the plan] was both unfair and unwarranted." (*Gambini, supra*, 486 F.3d at p. 1091.) The plaintiff then stormed out of the office and returned to her cubicle where she kicked and threw various items. The defendant later terminated the plaintiff's employment while she was out on medical leave. (*Id.* at p. 1092.)

The plaintiff sued, alleging disability discrimination and wrongful termination. (*Gambini, supra*, 486 F.3d at p. 1090.) A jury returned a verdict in the employer's favor on both claims. (*Id.* at p. 1092.) The *Gambini* court reversed on the discrimination claim, finding the trial court improperly refused to instruct the jury that conduct caused by a disability is part of the disability and not a separate basis for termination. (*Id.* at pp. 1093–1095.)

Wills argues *Gambini* involved threats of violence due to the turbulent nature of the plaintiff's outburst and evidence that she warned her supervisors they would regret their actions as she stormed out of the office. Whether the plaintiff actually made this statement was disputed, however, and the appellate court did not rely on it in reaching its decision. (*Gambini, supra*, 486 F.3d at pp. 1092, 1094–1095.) More importantly, the evidence showed the defendant terminated the plaintiff because her outburst generally frightened her coworkers, not because she made any threat against her supervisors or any other coworker. (*Id.* at p. 1094.) The *Gambini* court did not characterize the misconduct as threats or violence against coworkers, but as behavior that frightened coworkers. (*Id.* at pp. 1094–1095.)

The other cases Wills relies on, *Humphrey* and *Dark*, also did not concern threats or violence against coworkers. *Humphrey* involved an employee whose obsessive-compulsive disorder caused her to be chronically late or

---

and the disability itself for any disability other than alcoholism or drug use. (*Den Hartog, supra*, 129 F.3d at p. 1086.) But the court then retreats from that statement by acknowledging that (1) employers may hold disabled employees to the same conduct standards as other employees provided those standards are job related and consistent with business necessity and (2) "there are certain levels of disability-caused conduct that need not be tolerated or accommodated by employers." (*Id.* at pp. 1086, 1087.)

absent from work. (*Humphrey, supra,* 239 F.3d at pp. 1130–1131.) *Dark* involved an employee with epilepsy who drove his employer's vehicle despite experiencing symptoms he recognized as precursors to a seizure. (*Dark, supra,* 451 F.3d at pp. 1081, 1083–1084.)

In contrast to the dearth of support for Wills's position, the OC Court cites several cases holding an employer may terminate an employee for disability-caused misconduct involving threats or violence against coworkers. (See, e.g., *Sista v. CDC Ixis North America, Inc.* (2d Cir. 2006) 445 F.3d 161, 172 (*Sista*) ["[t]his approach ensures that this Court, like every other court to have taken up the issue, does not read the ADA to require that employers countenance dangerous misconduct, even if that misconduct is the result of a disability"]; *Calef v. Gillette* (1st Cir. 2003) 322 F.3d 75, 87 (*Calef*); *Jones v. American Postal Workers Union* (4th Cir. 1999) 192 F.3d 417, 429; *Hamilton v. Southwestern Bell Telephone Co.* (5th Cir. 1998) 136 F.3d 1047, 1052 (*Hamilton*); *Macy v. Hopkins County School Bd. of Education* (6th Cir. 2007) 484 F.3d 357, 366 (*Macy*); *Palmer v. Circuit Court of Cook County, Illinois* (7th Cir. 1997) 117 F.3d 351, 352 (*Palmer*).)

These cases conclude the ADA does not require an employer to retain an employee who threatens or commits acts of violence against coworkers, even if the employee's disability caused that misconduct. For example, *Palmer* states, "The Act does not require an employer to retain a potentially violent employee. Such a requirement would place the employer on a razor's edge—in jeopardy of violating the Act if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone." (*Palmer, supra,* 117 F.3d at p. 352.)

These cases are consistent with the EEOC's interpretation of the ADA on this issue. Specifically, the EEOC's Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities acknowledges an employer's authority to discipline an employee for threats or violence even when a disability causes the misconduct: "May an employer discipline an individual with a disability for violating a workplace conduct standard if the misconduct resulted from a disability? [¶] Yes, provided that the workplace conduct standard is job-related for the position in question and is consistent with business necessity. For example, *nothing in the ADA prevents an employer from maintaining a workplace free of violence or threats of violence,* or from disciplining an employee who steals or destroys property. Thus, an employer may discipline an employee with a disability for engaging in such misconduct if it would impose the same discipline on an employee without a disability." (EEOC, Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities, *supra,* question 30 <http://www.eeoc.gov/

policy/docs/psych.html> [as of Apr. 13, 2011], italics added & fn. omitted.) This is the same EEOC interpretation of the ADA the Tenth Circuit relied on in *Den Hartog*.

The interpretation does not itself constitute binding authority, but California courts "look to EEOC interpretations of the ADA when called upon to interpret comparable provisions of the FEHA." (*Knight v. Hayward Unified School Dist.* (2005) 132 Cal.App.4th 121, 130 [33 Cal.Rptr.3d 287]; see *Meritor Savings Bank v. Vinson* (1986) 477 U.S. 57, 65 [91 L.Ed.2d 49, 106 S.Ct. 2399] [" ' "while not controlling upon the courts by reason of their authority, [the EEOC guidelines] do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance" ' [citation]"].)

█ Wills does not address the EEOC's Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities. Instead, Wills relies on DFEH's 2008 Case Analysis Manual Update, which allegedly adopts *Gambini*'s observation that "conduct resulting from a disability is considered part of the disability, rather than a separate basis for termination." (*Gambini, supra,* 486 F.3d at p. 1093, quoting *Humphrey, supra,* 239 F.3d at pp. 1139–1140.) There are both practical and legal reasons why we are not persuaded by Wills's reliance on this manual. First, Wills failed to provide a copy of the manual to this court and the Internet address Wills cited for the manual is no longer available. Second, Wills did not request either this court or the trial court to judicially notice the manual. Third, the manual by its title does not purport to be prescriptive, but rather is self-described as a case analysis update. Finally and related, Wills failed to cite any authority this manual is equivalent to a regulation or any other official enactment entitled to deference. Indeed, the Fair Employment and Housing Commission, not DFEH, is authorized to adopt and promulgate regulations interpreting and implementing FEHA. (Gov. Code, § 12935, subd. (a).)

The foregoing demonstrates there is no uniform rule among the federal circuits regarding whether an employer may distinguish between disability-caused misconduct and the disability itself. We may reconcile these authorities, however, if we focus on the specific conduct giving rise to the adverse employment action. The foregoing authorities consistently hold an employer may distinguish between disability-caused misconduct and the disability itself when the misconduct includes threats or violence against coworkers. As explained above, the Ninth Circuit cases Wills relies on do not address that fact pattern.

█ Accordingly, consistent with the federal courts' interpretation of the ADA, we interpret FEHA as authorizing an employer to distinguish between disability-caused misconduct and the disability itself in the narrow context of

threats or violence against coworkers. If employers are not permitted to make this distinction, they are caught on the horns of a dilemma. ■ They may not discriminate against an employee based on a disability but, at the same time, must provide all employees with a safe work environment free from threats and violence. (See Lab. Code, §§ 6400, subd. (a) ["Every employer shall furnish employment and a place of employment that is safe and healthful for the employees therein."], 6403 ["No employer shall fail or neglect to do any of the following: [¶] (c) To do every other thing reasonably necessary to protect the life, safety, and health of employees."].) We believe our interpretation of FEHA strikes the appropriate balance between protecting employees suffering from a disability and allowing employers to protect their employees and others from threats of violence and the fear that a hostile or potentially violent employee will act on those threats. (See *Sista, supra,* 445 F.3d at p. 172; *Palmer, supra,* 117 F.3d at p. 352.)

We emphasize we are not presented with a situation involving misconduct impacting an employee's job performance the employer potentially could address through accommodation.[4] For example, an employer could accommodate an employee whose disability caused chronic tardiness or absenteeism by altering the employee's work schedule. (See *Humphrey, supra,* 239 F.3d at p. 1136.) We express no opinion on whether FEHA permits an employer to distinguish between disability-caused misconduct and the disability itself in any factual setting other than threats or violence against coworkers.

Wills asserts FEHA affords employees greater protection than the ADA and therefore no basis supports the distinction between disability-caused misconduct and the disability itself. Although FEHA provides employees broader protection than the ADA in some respects (see Gov. Code, § 12926.1,

---

[4] We reject Wills's claim she requested an accommodation for her disability simply by asking to return to work. A reasonable accommodation is defined as " 'a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job . . . .' " (*Scotch, supra,* 173 Cal.App.4th at p. 1010.) " 'Reasonable accommodation' does not include excusing a failure to control a controllable disability or giving an employee a 'second chance' to control the disability in the future." (*Brundage, supra,* 57 Cal.App.4th at p. 239; see also *Palmer, supra,* 117 F.3d at p. 353 [duty to provide reasonable accommodation does not "run[] in favor of employees who commit or threaten to commit violent acts"]; EEOC, Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities, *supra,* question 31 <http://www.eeoc.gov/policy/docs/psych.html> [as of Apr. 13, 2011] ["An employer must make reasonable accommodation to enable an otherwise qualified individual with a disability to meet such a conduct standard in the future, barring undue hardship. Because reasonable accommodation is always prospective, however, an employer is not required to excuse past misconduct." (fn. omitted)].)

subd. (a)),[5] federal authorities interpreting and applying the ADA are none-theless useful in interpreting FEHA, unless significant differences exist between the FEHA and ADA provisions at issue. (See *Bagatti v. Department of Rehabilitation* (2002) 97 Cal.App.4th 344, 358 [118 Cal.Rptr.2d 443].) Wills, however, fails to point to any FEHA provision that materially differs from the ADA for determining whether an employer may distinguish between disability-caused misconduct and the disability itself. To the contrary, Wills impliedly concedes there are no differences by relying extensively on federal authorities interpreting and applying the ADA on this issue.

Having concluded FEHA does not prohibit an employer from distinguishing between disability-caused misconduct and the disability itself when the mis-conduct involves threats or violence against coworkers, we next consider how a termination on these grounds fits into the *McDonnell Douglas* framework.

Wills acknowledges the *McDonnell Douglas* analysis applies to her disability claim, but offers no explanation how. The OC Court argues Wills's misconduct renders her unqualified for the job and therefore unable to establish her prima facie case in the *McDonnell Douglas* test's first stage. Alternatively, the OC Court argues Wills's threats should constitute a legitimate, nondiscriminatory reason for termination and satisfy the OC Court's second-stage burden in the *McDonnell Douglas* test.

Some cases distinguishing between disability-caused misconduct and the disability itself treat misconduct involving threats or violence as disqualifying an employee from employment, but those cases do not mention the *McDonnell Douglas* framework. (See, e.g., *Calef, supra,* 322 F.3d at p. 87; *Palmer, supra,* 117 F.3d at p. 352.) Other cases permitting this distinction treat the miscon-duct as a legitimate, nondiscriminatory reason for terminating an employee. (See, e.g., *Sista, supra,* 445 F.3d at pp. 171–172; *Macy, supra,* 484 F.3d at p. 366; *Hamilton, supra,* 136 F.3d at p. 1052.)

In *Sista,* the appellate court concluded employee misconduct involv-ing threats or violence fits within the second stage of the *McDonnell Douglas* burden-shifting approach. (*Sista, supra,* 445 F.3d at p. 172.) The *Sista* court explained the first stage of the *McDonnell Douglas* test places the burden on the employee to make a prima facie showing of discrimination. Among other things, this requires a minimal showing the employee is qualified for the job.

---

[5] Government Code section 12926.1, subdivision (a), provides as follows: "The law of this state in the area of disabilities provides protections independent from those in the federal Americans with Disabilities Act of 1990 (Public Law 101-336). Although the federal act provides a floor of protection, this state's law has always, even prior to passage of the federal act, afforded additional protections."

(*Sista*, at p. 171.) " '[M]isconduct is distinct . . . from the issue of minimal qualification to perform a job. An individual may well have the ability to perform job duties, even if her conduct on the job is inappropriate or offensive. Accordingly, the finding of misconduct here cannot preclude [the plaintiff] from showing her qualification for employment as required by *McDonnell Douglas*.' [Citation.]" (*Sista*, at pp. 171–172.)

The *Sista* court noted the *McDonnell Douglas* framework's second stage provides an employer the opportunity to explain the reasons for termination. Evidence the employer based the termination on the employee's workplace threats or violence rebuts the employee's prima facie showing by establishing the employer properly terminated the employee, even if the employee is otherwise qualified to perform the job. (*Sista, supra*, 445 F.3d at p. 172.)

Evaluating the evidence of the employee's threatening or violent conduct toward coworkers in the *McDonnell Douglas*'s second stage also preserves the employee's right to pursue claims against employers who enforce their workplace rules against threats or violence in a discriminatory manner. If misconduct involving threats or violence provided a ground for disqualifying an otherwise qualified employee, the court hearing a summary judgment motion would stop the analysis at the first stage of the modified *McDonnell Douglas* test because the employee could not establish a prima facie case. This would deny the employee the opportunity to present evidence showing the employer did not terminate or discipline other employees who engaged in the same misconduct. Considering threats and violence against coworkers in the *McDonnell Douglas* test's second stage preserves the employee's opportunity to show the employer used the employee's alleged workplace threats or violence as a pretext for terminating the employee on a protected ground, such as a mental disability.

Consequently, we agree with *Sista* that misconduct involving threats or violence against coworkers is properly considered a legitimate, nondiscriminatory reason for terminating the employee. An employer making this showing at summary judgment shifts the onus under the *McDonnell Douglas* framework to the employee to show the employer used this reason as a pretext for discriminatory action. This approach is consistent with the rationale supporting the *McDonnell Douglas* burden-shifting approach. (*Sista, supra*, 445 F.3d at p. 172.)

We emphasize our analysis and conclusions are based on the facts this case presents, specifically, an employee who engaged in misconduct by making threats against coworkers. The OC Court made no argument that Wills posed an actual threat of harm to her coworkers. In fact, Wills presented evidence from her treating physician that she posed no danger to anyone, and the OC

Court did not present any evidence to rebut that conclusion. Wills's termination notice made clear the OC Court discharged her for violating its written policy against making threats in the workplace. Thus, our analysis focuses on making the threats, not on whether the employee would carry out the threats.

These circumstances must be distinguished from a scenario involving an employee whose disability actually endangers the health or safety of coworkers. As discussed above, FEHA does not expressly address whether the act protects an employee whose disability causes him or her to make threats against coworkers. FEHA, however, does authorize an employer to terminate or refuse to hire an employee who poses an actual threat of harm to others due to a disability: "This part does not prohibit an employer from refusing to hire or discharging an employee with a physical or mental disability . . . where the employee, because of his or her physical or mental disability, . . . cannot perform [his or her essential] duties in a manner that would not endanger his or her health or safety or the health or safety of others even with reasonable accommodations." (Gov. Code, § 12940, subd. (a)(1); see, e.g., *E.E.O.C. v. United Parcel Service, Inc.* (9th Cir. 2005) 424 F.3d 1060, 1074–1077 [FEHA permits delivery business to decline to hire drivers with vision problems because their driving posed risk of danger to others].) Case law and secondary sources state this provision provides an affirmative defense employers may assert outside the *McDonnell Douglas* framework when an employee poses an actual threat to health or safety in the workplace.[6] (See *Raytheon Co. v. Fair Employment & Housing Com.* (1989) 212 Cal.App.3d 1242, 1252 [261 Cal.Rptr. 197]; Chin et al., Cal. Practice Guide: Employment Litigation, *supra*, ¶ 9:2447, p. 9-192 (rev. # 1, 2009); 2 Wilcox,

---

[6] The law may be unsettled on whether this provision in Government Code section 12940, subdivision (a)(1), continues to provide an affirmative defense, as opposed to an element of the plaintiff's prima facie case. In *Green v. State of California* (2007) 42 Cal.4th 254 [64 Cal.Rptr.3d 390, 165 P.3d 118], the California Supreme Court held that whether an employee is a qualified individual (that is, whether he or she can perform the essential functions of the job with or without reasonable accommodation) is part of the employee's prima facie case and not an affirmative defense on which the employer bears the burden of proof. (*Id.* at p. 260.) *Green*, however, construed a different part of Government Code section 12940, subdivision (a)(1), regarding whether the employee can perform the essential job functions at all. It did not address who bears the burden of proof on whether an employee can perform essential job functions without endangering health or safety. No reported California case since *Green* has addressed who bears that burden.

The ADA also authorizes an employer to terminate or refuse to hire a disabled individual who poses a "direct threat to the health or safety of other individuals in the workplace" and no reasonable accommodation exists that would eliminate the risk. (42 U.S.C. § 12113(b); see *id.*, §§ 12111(3), 12113(a).) Several circuits have held this ADA provision establishes an affirmative defense on which the employer bears the burden of proof. (*Branham v. Snow* (7th Cir. 2004) 392 F.3d 896, 906–907, fn. 5 [collecting cases].) Other courts have held that the employee bears the burden of proof on this issue, at least where safety is a job qualification. (*Ibid.*; see also *McKenzie v. Benton* (10th Cir. 2004) 388 F.3d 1342, 1353–1356.)

Cal. Employment Law (2010) Employee's Inability to Perform Job or Danger to Health and Safety, § 41.97[1], pp. 41-492 to 41-495 (rel. 39-5/2009).)

The OC Court did not seek summary judgment on the ground Wills posed an actual threat of harm to anyone. Accordingly, our opinion does not address employees who pose a risk of harm to themselves or others due to a disability.

### 3. *The Trial Court Did Not Err in Granting Summary Judgment*

Here, the OC Court bore the initial burden on its summary judgment motion to present evidence either (1) negating an essential element of Wills's prima facie case (*Arteaga, supra,* 163 Cal.App.4th at p. 344) or (2) establishing a legitimate, nondiscriminatory reason for terminating Wills's employment (*Scotch, supra,* 173 Cal.App.4th at p. 1005). The OC Court asserts it satisfied both prongs in making its initial showing.

As part of her prima facie case, Wills must establish she was qualified to perform the essential duties of her job. (*Sandell, supra,* 188 Cal.App.4th at p. 310.) The OC Court contends it negated this essential element of Wills's prima facie case by presenting evidence showing Wills made threats against her coworkers. According to the OC Court, Wills's threats disqualified her from her job.

We conclude, however, the OC Court failed to present sufficient evidence to negate this element of Wills's prima facie case for three reasons. First, the OC Court failed to present any evidence establishing the essential duties of Wills's job. Without evidence establishing those essential duties, we cannot assume Wills's misconduct toward her coworkers prevented her from performing her job. Second, as discussed in the prior section, we conclude threats against coworkers do not disqualify an employee from his or her job, but rather may provide a legitimate, nondiscriminatory reason for discharging the employee. Finally, the OC Court's termination notice informed Wills it discharged her for misconduct; it did not claim she was unqualified for her job. This included the charge Wills demonstrated poor judgment, which was based on her misconduct rather than an inability to perform her job.

 The OC Court still could shift the burden to Wills by presenting admissible evidence showing a legitimate, nondiscriminatory reason for terminating her. (*Arteaga, supra,* 163 Cal.App.4th at pp. 342–343; *Scotch, supra,* 173 Cal.App.4th at p. 1004.) "It is the employer's honest belief in the stated reasons for firing an employee and not the objective truth or falsity of the underlying facts that is at issue in a discrimination case." (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 436 [60 Cal.Rptr.3d 359]

(*King*).) As the Supreme Court explained in *Guz*, "if nondiscriminatory, [the employer's] true reasons need not necessarily have been wise or correct. [Citations.] While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*. Thus, 'legitimate' reasons [citation] in this context are reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding *of discrimination*. [Citations.]" (*Guz, supra*, 24 Cal.4th at p. 358, original italics.)

The OC Court presented sufficient evidence to meet this burden by showing it terminated Wills for the legitimate, nondiscriminatory reason she violated its written policy against verbal threats and threatening conduct in the workplace. The termination notice the OC Court issued to Wills specifically cited her conduct at the Anaheim Police Department and the ringtone and e-mail messages as the grounds for terminating her employment. The notice explained both the Anaheim Police Department and Wills's coworkers reported these incidents to the OC Court and complained Wills's conduct threatened and alarmed them. Finally, the notice explained the OC Court's investigation concluded each incident violated its written policy against workplace threats and violence.

The burden then shifted to Wills to "offer substantial evidence that [the OC Court's] stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." (*Hersant, supra*, 57 Cal.App.4th at pp. 1004–1005; see *Reeves, supra*, 530 U.S. at p. 142.)

Wills does not dispute engaging in any of the underlying conduct, but nonetheless contends she met her burden in two ways. First, she argues a triable issue of material fact existed on whether her conduct reasonably could be interpreted as a threat. In particular, she disputed the context of the "Kill Bill" comment and asserted she was merely joking.[7] She also asserted she sent the ringtone as a joke and the e-mail messages were not threats, but actually expressed gratitude for the support her coworkers had shown her.

This is not sufficient to create a triable issue of material fact because the question is not whether Wills's comments and conduct reasonably could be construed as threatening. Rather, the question is whether the OC Court

---

[7] Although Wills disputed the context of the "Kill Bill" comment and asserted it was a joke, she cited no evidence to dispute the fact she angrily yelled at several Anaheim Police Department employees and warned Nellesen never to leave her out in the heat again.

honestly believed Wills violated its written policy against verbal threats, threatening conduct, and violence. (*King, supra*, 152 Cal.App.4th at p. 436; *Villiarimo v. Aloha Island Air, Inc.* (9th Cir. 2002) 281 F.3d 1054, 1063, original italics ["In judging whether [the employer's] proffered justifications were 'false,' it is not important whether they were *objectively* false (e.g., whether [the employee] *actually* lied). Rather, courts 'only require that an employer honestly believed its reason for its actions, even if its reason is "foolish or trivial or even baseless." ' "].) Wills failed to cite any evidence the OC Court did not honestly believe she violated its policy against workplace threats and violence.

■ Wills also argued a triable issue of fact existed as to whether the OC Court used the grounds for her termination as a pretext for discrimination because the OC Court treated other employees who engaged in similar conduct more favorably. Showing disparate treatment or policy enforcement is a permissible means to establish pretext. (See, e.g., *McDonnell Douglas Corp. v. Green, supra*, 411 U.S. at p. 804 ["Especially relevant to such a showing [of pretext] would be evidence that white employees involved in acts against petitioner of comparable seriousness to the 'stall-in' were nevertheless retained or rehired."].)

To establish pretext in this manner, Wills must identify other similarly situated employees the OC Court did not terminate. Another employee is similarly situated if, among other things, he or she " 'engaged in the same conduct without any mitigating or distinguishing circumstances.' " (*Marquez v. Bridgestone/Firestone, Inc.* (8th Cir. 2004) 353 F.3d 1037, 1038 (*Marquez*).)

The first employee Wills identified was the coworker in the elevator who told Wills's friend she would not say anything if the friend wanted to assault Wills. The coworker made the comment after Wills joked she did not want to hold the elevator for her friend, who rushed to reach the elevator before it closed.

Wills argues this employee was similarly situated because the coworker physically threatened Wills, who feared for her safety, in the same way Wills threatened other employees and the Anaheim Police Department personnel. The facts, however, do not support this comparison. The OC Court hired an independent investigator to look into Wills's allegations regarding the elevator incident. The investigator found the coworker's comment offensive and inappropriate, but did not constitute a credible, physical threat against Wills. The investigator noted the coworker making the comment did not directly

threaten Wills with harm, but merely indicated she would look the other way if Wills's friend wanted to hit Wills.

In contrast, Wills directly threatened harm to others. At the Anaheim Police Department, she yelled and swore at employees, threatened to put them on her "Kill Bill" list, and warned them never to leave her outside again. The ringtone and e-mail messages also directly threatened their recipients. The comment in the elevator did not rise to the same level as Wills's conduct at the Anaheim Police Department or in sending the ringtone or e-mail messages. (See *Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1113 [60 Cal.Rptr.3d 45] [rejecting pretext argument on summary judgment because the coworkers' misconduct did not rise to the same level as the plaintiff's misconduct].)

The second employee Wills identified as similarly situated had an "unprofessional demeanor" and frightened other staff members. According to Wills's supervisor, this employee "got out of control a few times with other staff members," raised her voice, argued with several other employees, and sometimes became volatile. The evidence presented failed to show this employee engaged in the same conduct as Wills "without any mitigating or distinguishing circumstances." (*Marquez, supra,* 353 F.3d at p. 1038.) Wills failed to provide any evidence showing the circumstances surrounding this employee's conduct. Moreover, the supervisor specifically testified the employee did not threaten others.

Finally, Wills relied on an OC Court declaration describing the disciplinary action it took against three employees to show it takes seriously all conduct reasonably perceived as a threat. She complains the OC Court disciplined only one of these three employees by imposing a 10-day suspension, and concludes this disparity demonstrates her firing was a pretext for disability discrimination. Contrary to Wills's contention, the OC Court issued notices of intent to discharge to the other two employees. Moreover, these three employees did not make direct threats against coworkers. Thus, Wills failed to provide sufficient evidence to show the OC Court treated any similarly situated employee more favorably.

In conclusion, the OC Court met its burden to establish a legitimate, nondiscriminatory reason for terminating Wills's employment and Wills failed to present substantial evidence showing that reason was false or a pretext for discrimination. Wills presented no evidence supporting an inference the OC Court acted with any discriminatory animus in terminating her employment.

## III

### DISPOSITION

The judgment is affirmed. The OC Court shall recover its costs on appeal.

Rylaarsdam, Acting P. J., and Fybel, J., concurred.

A petition for a rehearing was denied May 12, 2011, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied July 20, 2011, S193342.