Filed 2/9/22  Wade v. Starbucks Corp. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| MADDIE WADE,<br><br>　　　Plaintiff and Appellant,<br><br>　　　　　v.<br><br>STARBUCKS CORPORATION et al.,<br><br>　　　Defendants and Respondents. | F079838<br><br>(Super. Ct. No. 18CECG02779)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Kimberly Gaab, Judge.

Peter Law Group, Arnold P. Peter, Eyal Farahan; Impact Fund, Lindsay Nako, David S. Nahmias, for Plaintiff and Appellant.

Ehlert Hicks and Allison L. Ehlert for California Employment Lawyers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

LAMBDA Legal Defense & Education Fund, Sasha Buchert and Ethan Rice; National Center for Lesbian Rights, Julie Wilensky and Asaf Orr, as Amicus Curiae on behalf of Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Tracey A. Kennedy, Brett D. Young, for Defendants and Respondents.

-ooOoo-

Plaintiff Maddie Wade filed a discrimination, harassment, and wrongful constructive discharge action against her former employer, Starbucks Corporation, and former store manager, Dustin Guthrie. Wade alleged (1) Guthrie subjected her to discrimination and harassment based on her gender identity after she informed him that she had been diagnosed with gender dysphoria and was transgender and would be starting a gender-affirming transition from male to female; and (2) she was forced to resign from Starbucks as a result of Guthrie's discriminatory and harassing conduct. The trial court granted summary judgment in favor of Starbucks and Guthrie as to all of Wade's claims. Wade appealed. We affirm.

## PROCEDURAL HISTORY

Wade filed the complaint underlying this action in the Fresno County Superior Court on July 26, 2018. Wade's complaint alleged (1) wrongful constructive termination in violation of public policy, as to Starbucks; (2) discrimination on the basis of sex, gender, gender identity, and/or gender expression in violation of the Fair Employment and Housing Act (FEHA; Gov. Code, § 12940, subd. (a), et seq.), as to Starbucks; (3) harassment on the basis of sex, gender, gender identity, and/or gender expression in violation of FEHA, as to Starbucks and Guthrie; and (4) intentional infliction of emotional distress (IIED), as to Starbucks and Guthrie. Wade's complaint also sought punitive damages.

Following substantial discovery, including a deposition of Wade spanning two days and a deposition of Guthrie, defendants moved for summary judgment, or in the alternative, summary adjudication, as to Wade's claims and her request for punitive damages. Guthrie's motion as to the two causes of action against him and the claim for punitive damages, was filed on March 7, 2019, and Starbucks's separate motion as to all the causes of action and the claim for punitive damages, was filed on March 28, 2019. Wade filed oppositions to the motions on May 6 and 9, 2019, respectively; she attached a

2.

detailed personal declaration to both oppositions. Both defendants filed replies on June 6, 2019.

On June 11, 2019, the trial court held a hearing on the motions, having previously issued a tentative ruling granting defendants' motions for summary judgment on all four causes of action. On July 3, 2019, the trial court issued its final order granting summary judgment in favor of defendants on all of Wade's claims. The court entered judgment for defendants on July 19, 2019.

**FACTS**

On review of summary judgment, we view the facts in the light most favorable to plaintiff as the losing party below. (*Carlsen v. Koivumaki* (2014) 227 Cal.App.4th 879, 884, fn. 5.)

### A. Wade Was Employed by Starbucks

Wade began working as a barista at a Starbucks store in Fresno, in October 2009. Five years later, in 2014, she was promoted to shift supervisor. Wade transferred to a different Starbucks store in November 2016. Her new store was located at the intersection of Herndon and Milburn Avenues in Fresno.

In July 2017, Dustin Guthrie became the store manager at the Herndon and Milburn Starbucks store. According to Wade, she and Guthrie quickly developed a positive relationship with one another, and Wade considered Guthrie a " 'work friend.' "

Wade began to further develop her skills as a shift supervisor under Guthrie, and she gave him several "thank you" notes and "on-the-spot cards" during the time they worked together.[1] Wade wrote sincere, positive comments in the cards because "in a lot of ways, [Guthrie] was a good manager." For example, Wade wrote Guthrie a note stating: "I couldn't ask for a better manager. I appreciate you to the fullest. Thanks for

---

[1] Wade explained in her deposition that "on-the-spot cards" are used to congratulate coworkers when "they do things right," and to encourage them.

3.

everything – Matt."[2]  In another note, Wade wrote:  "I like your style and you are a perfect fit for [the store] … I appreciate you – Matt."  Other notes state, "Thanks for always doing what you can do to help,"  "I'm happy to have you as our manager,"  "You are a great manager,"  and "I appreciate you," among other similar comments.  Wade also contributed to a "thank you" gift for Guthrie and inscribed a card as follows:  "Hey, I appreciate everything you've done for this store and the people in it.  You are hands down the best manager I have ever had an opportunity to work with in my entire Starbucks [career].  Thank you for everything, [you're] the best."  Wade told Guthrie that she wanted to advance her career at Starbucks and aspired to be promoted to assistant manager; Guthrie was generally supportive of Wade's interest in further developing her skills.  Guthrie had offered to assist Wade in taking an assessment or undergoing training for the assistant manager role.

B.    **Wade Was Diagnosed With Gender Dysphoria and Informed Guthrie of Her Plan to Transition**

On approximately October 1, 2017, Wade told Guthrie she had been diagnosed with gender dysphoria and planned to transition to female.  In a declaration attached to her opposition papers, Wade noted:  "I was born and lived as a male until late 2017, and I was diagnosed with 'gender dysphoria' in or about October 2017."

Wade was the first transgender individual Guthrie was aware of ever meeting, and he had no idea what to expect when it came to Wade's transition.  The day after their conversation, Guthrie told Wade "he was having a hard time wrapping his head around the fact of transitioning."  But he told her that her positive impact on the store helped him feel differently about her transition.

Wade did not provide Guthrie with many details during their conversation about her plan to transition.  Guthrie and Wade did, however, discuss accommodations,

_____

**2**    Wade was formerly known as Matthew ("Matt") Wade.

4.

including whether Wade wanted to change her shifts or adjust her responsibilities in order to focus on her gender transition. Guthrie asked Wade to inform him as to time off needed for doctor's appointments or any other issues related to her transition, so he could adjust her schedule accordingly. Guthrie was supportive during the October 2017 conversation in which Wade informed him she was planning to transition and told Wade he wanted to help her through the process she was embarking on as best as he could.

Wade testified that, during her October 2017 conversation with Guthrie, she had touched upon the question of her name as part of her transition. Wade suggested she be called "Maddie," but left the issue "open-ended" because it was "no big deal." Wade indicated to Guthrie that it would be fine "[i]f [he] would just refrain from calling [her] Matt and male pronouns." Wade did not present as female at work during her transition. Wade explained in her deposition: "I didn't expect anybody to just convert to calling me 'Maddie,' especially when I didn't look like Maddie yet." Wade further noted in her deposition: "So all I asked was for people to try to avoid calling me Matt, if possible, and try to avoid male pronouns. That was the only thing I asked of anybody there."

Almost the entire time that Wade worked at the Herndon and Milburn Starbucks, after beginning her transition, Wade used the name "Matt" on her nametag at the store; toward the end of her time there, Wade used the name "Maddie" on her nametag. She also used her given legal name to sign Starbucks work-related paperwork. To the extent Wade wrote on-the-spot notes and cards to Guthrie *after* beginning her transition—which Wade said was "probably" the case—she signed those "Matt" as well. Wade explained in her deposition why she signed the cards in that way; she said, "that's what I was going by at that time, as far as my legal name." Wade added: "I understood that – you know, it was kind of weird at the time to expect anybody to call me Maddie, but I just [p]referred that they not use male pronouns or call me Matt."

**C. As Wade Proceeded With Her Gender Transition, Her Interactions With Guthrie Changed and Became More Limited**

As Wade's transition proceeded, Wade began to take time off, and often needed to leave prior to the end of her assigned shifts, to attend to matters connected to her transition. Wade would have a barista cover for her in her absence; this was not ideal for the store's operations as baristas are not qualified to perform all functions of a shift supervisor. Guthrie spoke to Wade about these issues and explained he wanted to move her to later shifts so she could complete her shifts and scheduled hours. In the weeks or early months following the beginning of Wade's transition, Guthrie kept Wade's scheduled hours mostly the same after factoring in her scheduled time off, but experimented with changing her scheduled starting and ending times to later in the day. Wade did not object to the change in her schedule initially; when she complained after a few weeks, Guthrie "stopped having her scheduled to close."

As for the number of hours Wade worked weekly, Guthrie testified at deposition: "I did my best to schedule [Wade] as many hours as I possibly could. There is always a fluctuation in business." Guthrie testified that, as reflected in time, attendance, and scheduling records, after the holiday season ended, he reduced Wade's hours, based on the store's changed business needs. Guthrie noted he reduced the hours of other employees at the same time. Wade testified at deposition she had been working, on average, approximately 36 to 38 hours per week leading up to her transition. However, several weeks after her October 1, 2017 conversation with Guthrie, her scheduled hours dipped under 30 hours a week and remained under 36 hours per week over the next few months. The lowest number of hours that Wade worked in a week during that period was 23 hours. Wade did not complain to Partner Resources (Starbucks's human resources department) about her scheduled hours.[3] At another point in her deposition, Wade noted that sometime around February 2018, her hours went up again. Wade also contended in a

---

[3] Starbucks employees are internally referred to as "partners."

6.

declaration attached to her opposition papers that Guthrie did not bring up or follow through on the issue of an assessment for an assistant manager position.

Wade testified that Guthrie treated her "[u]nfairly" in the months after she told him she was transitioning. Wade described Guthrie as someone who was often in a grumpy mood with everyone in the store. Guthrie would "leer" at, or give bad looks to, homeless people in the store and would also be short with, and give dirty looks to, all store employees, when he was in bad mood. Wade referred to Guthrie's bad looks or dirty looks as "leering." Guthrie would be in a bad mood "probably two or three times a week," and since he wore "his emotions on his sleeve," others would suffer for it. "If [an employee] got on his bad side during one of those times, [the grumpiness] was directed towards [that employee]." Wade was not on the receiving end "so much." However, Wade noted: "I got some pretty dirty looks several times, and I believe that a lot of things [Guthrie] said [were] inappropriate, including [to] me and including things that he [said] to other people as well." For example, Guthrie would threaten to write up "a whole staff of people on the floor for leaving cup sleeves and cup lids on a counter, slightly in a disarray order." In fact, Guthrie generally had "a bad demeanor while talking to people." "If he was upset about anything, even that had nothing to do with the store, he would come in and have that showing to everybody as well."

Guthrie and Wade would work together at the store "usually at least four days a week … 20, 30 minutes apiece a day," adding up to "probably two, three hours, in total, a week." They also "worked on the floor together pretty often during peak hours," a two-hour window. As Wade's transition proceeded, in addition to "cutting [her] hours," Guthrie "interacted with [her] less." Wade noted: "We had – went from communicating nearly every day to communicating maybe once a week." She added: "I mean, we would talk on average before that, at least for 30, 40 minutes a day just in passing, and certain information and stuff like that. After that, I was lucky if I were to talk to him for 20 minutes in a week." Wade also described an incident when Guthrie was upset over the

7.

way a mop bucket had been tossed in a sink. Wade explained: "It was about a mop bucket that was being stored upside down. He had a thing, saying that he was mad at people for throwing the mop bucket in there and not putting it – placing it in there nicely, I guess." Guthrie was "complaining about it" and "threatening to get people in trouble." Wade testified: "He threatened to write me up, and my whole crew, for that night." One time Guthrie asked Wade to "help find out a solution to a problem," but then told her, " 'How does that help?' "

In light of Guthrie's attitude and demeanor, Wade asked him about her performance, but Guthrie said she was "doing fine." In December 2017, Wade asked Guthrie for confirmation that she was meeting expectations. Guthrie assured her she was meeting expectations and confirmed he had no complaints about her performance. In late December 2017, or early January 2018, Guthrie asked whether Wade wanted to take a step back from her career goals to focus on her transition. Wade responded she was ready for both and wanted more work hours, to which Guthrie responded, "okay, we'll figure it out." In late January or early February 2018, Wade wrote Guthrie a letter in which she again sought reassurance about her performance and suggested it might be best for her to work fewer hours (although she did not really want that outcome); Guthrie did not respond to the letter.

While Wade wore, for most of her time at Guthrie's store, a nametag reflecting the name, "Matt," indicating she was going by that name at work, many, but not all, of her coworkers referred to her as Maddie. Wade testified at deposition that Guthrie never referred to her as "Maddie," or used female pronouns to refer to her.

Wade noted at deposition that she had great coworkers, who were "really supportive" of her transition. Wade also confirmed that she had never heard Guthrie make any anti-transgender statements at any point before her October 1, 2017 discussion with him about beginning her transition. Similarly, Guthrie never made any anti-transgender comments at any point after Wade began her transition. Wade also testified

8.

she had never heard from anybody else that Guthrie made any type of negative comments about her and her transition. Wade confirmed that Guthrie never touched her inappropriately. Guthrie also never suspended her or gave her any corrective action.

Wade said at deposition that Guthrie was the only person at Starbucks who mistreated her during her employment (although she had other types of complaints about other Starbucks personnel). Wade reiterated that Guthrie was the only person at Starbucks who treated her differently because of her gender identity. Wade demurred when asked whether she would "describe any of [Guthrie's] conduct as outrageous"; rather, she said, "there was times that he did things unprofessionally." When asked whether Guthrie's conduct could be described as "extreme," Wade said yes, and pointed to the incident when Guthrie threatened to write up "the whole staff on the floor about a mop bucket being put into the sink in a way that he said was wrong when it was correct." Wade also pointed to the incident when Guthrie had found "lids or something stored incorrectly somewhere on the side of a thing, [and had said] if I ever find this again, the whole staff is going to get written up." When pressed for any other examples of extreme behavior by Guthrie, Wade responded, "just [his] facial expressions, leering, having a bad attitude towards situations he finds undesirable."

### D. Starbucks's "Best Practices" Guidelines Regarding Transgender Employees

After learning of Wade's plans to transition, Guthrie sought guidance from his district manager Alissa S. regarding Wade's situation. Alissa sent Guthrie recently released "best practices" guidelines for supporting transgender employees: Workplace Guidelines for Supporting Transgender Partners (workplace guidelines or guidelines). Guthrie told Alissa that Wade had not discussed specifics "to really set anything in motion," but had wanted to make Guthrie aware of her situation and Guthrie was doing the same as to Alissa. Guthrie recollected he and Wade verbally discussed her needs,

including Wade's requests for time off for appointments and patience through her transition process.

The stated purpose of Starbucks's workplace guidelines is to "support Starbucks culture of belonging, diversity and inclusion, and provide best practice information on how to support a partner who is going through a gender transition in the workplace," as "discrimination against transgender individuals is strictly prohibited."

The workplace guidelines define terms such as "gender expression," "gender identity," "transgender person," "gender transition," and "known as" name. With regard to "known as name," the guidelines state: "A partner may commonly use and be known by another name or nickname rather than the legal name. When provided by the partner, some of Starbucks systems will display the 'known as' name for the partner's convenience, including the Point of Sale system, the Partner Hub, the partner card, etc. A partner does not need a legal name change or any official documentation to change the 'known as' name." The guidelines explain: "To submit a 'known-as' name, partners may access My Partner Info (MPI) and edit their own personal information." The guidelines add: "Managers should assist partners when new names are needed on documentation or other identifiers as the result of a name change, such as helping the partner secure a new access badge, name badge, desk name plate, etc." The guidelines also direct all employees to contact the Partner Contact Center at a phone number provided, with any questions on updating names.

The guidelines suggest that partners undergoing a transition in the workplace should engage various "stakeholders to help plan and support the transition, such as Partner Resources, a representative from Starbucks Pride Alliance Network, or other co-workers or key contacts," and to "[b]e prepared to help educate others, including the supervisor, on what to expect and specific needs." The guidelines also suggest that partners undergoing a transition in the workplace should "[p]lan transition details" with

10.

the supervisor, including "[w]hat changes will be needed for records, systems and signage, and when."

Similarly, the guidelines provide "best practice ideas for managers to consider in supporting a partner who is undergoing a gender transition in the workplace." Managers may consider, "[w]ith the [affected] partner's input, develop[ing] a plan with the partner to support the transition, that may include: [¶] [d]ate of the transition, e.g., the first day of the change in gender presentation, name and pronoun usage[;] [¶] [p]referred pronouns[;] [¶] … [a]ny planned time off for medical treatment, if known[;] [¶] [w]hat changes will be needed for records, systems and signage, and when to submit requests[;] [¶] … [w]hether an educational training session … before the date of transition may be of benefit." The guidelines also suggest that, after the transition has occurred, managers "[l]ead by example" and "use the partner's new name and pronouns in all official and unofficial communications."

At deposition, Wade noted with respect to Starbucks's policies regarding transgender employees: "They do have some bit of guidelines. They [also] offer additional coverage when it comes to surgical procedures, things like that. And it's an inclusive workplace, so yeah. They – they do protect transgender individuals at Starbucks."

### E. Wade Transferred From Guthrie's Store and Took a Leave of Absence for Facial Surgery

In late January or early February 2018, Wade talked to Joy G., the manager of a Starbucks store at Barstow and Blackstone Avenues, about transferring to Joy's store.[4] Around mid-February 2018, Wade's transfer request was approved by all concerned, including Guthrie, Joy, and the district manager. Wade had discussed her transition with

---

**4** The record reflects that the name of the manager of the Starbucks store at Barstow and Blackstone Avenues was Joy H. However, since the parties and the trial court refer to Joy H. as Joy G., so do we.

11.

Joy, who was supportive and "backed" Wade's decision to transfer. Joy approved Wade's transfer even though Wade planned to immediately take, and upon the transfer taking effect did take, an extended leave of absence for facial feminization surgery related to her transition.

Wade's transfer to the Barstow and Blackstone Starbucks store took effect on March 14, 2018. Wade went on leave from March 11, 2018 to May 7, 2018; her leave included an initial two weeks of personal leave followed by six weeks of medical leave. Prior to her transfer, on January 25, 2018, Wade had texted Guthrie, "Thanks Dustin, you are awesome. I'm happy to be part of this team as well. I have never seen a store on par with what we have here." On Wade's last day of work at the Herndon and Milburn store, Guthrie organized a small send-off gathering and bought a cake for Wade. While Wade was on her leave of absence, Guthrie organized a store celebration dinner; he invited Wade to the dinner with him and her former coworkers. Wade accepted the invitation and attended the event.

**F.** **Wade Returned to Work After Her Leave of Absence and Resigned Three Weeks Later**

Wade returned to work from her leave in early May 2018 and resigned three weeks later. About one week after she returned from leave, Wade asked Joy to set up a meeting with the new district manager, Tatiana S., about Guthrie's alleged mistreatment of Wade. Joy reached out to Tatiana on Wade's behalf but also suggested Wade speak with Guthrie directly, a suggestion that Wade declined. Tatiana contacted Wade via text message to set up a meeting. Wade responded with her availability, but Tatiana did not get back to her right away. When Wade did not hear back from Tatiana for about one week, she abruptly resigned, without notice, on June 5, 2018. Wade acknowledged she had not attempted to contact another Starbucks representative, such as Partner Resources (Starbucks's human resources).

12.

Wade was happy with her coworkers at the new store but was unhappy with the way Joy ran the store and handled various administrative issues; the store staff "had made several complaints about [Joy]" up the chain, even before Wade got there. Wade explained, in her deposition and in her subsequent declaration, the reasons for her resignation: (1) Joy had suggested Wade talk to Guthrie and also contacted the new district manager, Tatiana, on Wade's behalf, but Wade, who declined to talk to Guthrie, was not able to promptly meet with Tatiana to discuss her concerns about Guthrie; (2) Joy ignored company policy on certain administrative matters unrelated to Wade's transgender status (for example, Joy did not have a proper protocol for employees to access the store's safes and had not fixed a broken store alarm system); (3) Wade had "accumulated stress," including from her ongoing and "partial" recovery from "facial feminization surgery"; and (4) Joy brushed off concerns brought to her attention about issues in the store, none of which pertained to any misconduct by Starbucks employees (along with raising various administrative concerns, Wade had complained about the behavior of some customers who had referred to her as "sir" and "man").

G. **After Wade's Employment Ended, She Became Aware of Social Media Posts Made by Guthrie That Reflected Conservative Social and Political Views As Well As Disparaging Treatment of Transgender Issues**

Wade attached, to her complaint, approximately 10 social media posts that Guthrie had made over the course of several years, ending in November 2017. The posts covered many political topics, including gender identity issues. Wade testified she was completely unaware of Guthrie's social media accounts and posts until after her employment with Starbucks had ended. After Wade resigned from Starbucks, Wade's boyfriend, in June 2018, found and showed her the posts. Wade testified Guthrie never made any comments to her at work along the lines of those reflected in the social media posts.

13.

The posts at issue were mostly tweets or memes and political images that Guthrie reposted on his own social media accounts. For example, on October 9, 2014, Guthrie tweeted: "Gender is not now, nor has it ever been a preference." On February 14, 2016, Guthrie posted three tweets or memes deriding the former Olympian and transgender public figure, Caitlyn Jenner, using her prior male name; one meme questioned whether Jenner was a woman and another tweet or meme observed Jenner "just wanted to cross dress without being judged." On September 21, 2017, Guthrie posted a meme consisting of an image of John Wayne superimposed with the following statement: "Cutting off your pecker doesn't make you a woman[.] It just makes you a guy that cut off his damn pecker." (Unnecessary capitalization omitted.) On November 29, 2017, Guthrie retweeted a political meme about "leftist logic" that mocked the assertedly"leftist" notions that "men are inherently dangerous, and women are better, and men can be women, and we should let men in the women's room, and women shouldn't carry guns because only police should have them, and police are racist lunatics who murder unarmed civilians in broad daylight." (Unnecessary capitalization omitted.) There were other tweets and posts in a similar vein.

Guthrie described the social media posts as "a sick joke that [he] shared." Guthrie's social media use was part of his "personal life" and Guthrie did not make the posts to offend transgender persons; it never crossed Guthrie's mind "specifically that a Starbucks employee would see [them]."

## H.     Wade's Assessment of the Emotional Impact She Suffered

Wade described the emotional toll of Guthrie's alleged conduct as follows: "Well, I mean, it took away all of my security for transition. It took away all of my income. I have a car that I – I can't make payments on … I had to put, basically, my life on the sidelines. As well as, you know, I lost all my medical care … [and] … my therapist.… And I also missed out on my surgery revisions, because I lost my coverage. So now I'm going to have to pay for another surgery instead of it being totalled [*sic*] into what I

14.

already paid to them." Wade added: "I've been struggling with a lack of self-confidence since then.… [¶] … I've still been quite anxious and depressed." Asked to elaborate on any emotional distress she suffered, Wade stated: "Anxiety. I mean, I – lack of – kind of lost some confidence. I mean, I lost my job essentially and kind of my ability to be able to work in a customer-facing job, pretty much." Wade testified that around the time she resigned, she had obtained a referral for work stress therapy from her gender therapist but did not actually seek the therapy because she resigned and did not have insurance.

## DISCUSSION

### I. Summary Judgment: Standard of Review

Any party may move for summary judgment in an action if it is contended that the action has no merit. (Code Civ. Proc., § 437c, subd. (a).)

"Summary judgment is granted when there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) This court reviews de novo the trial court's decision to grant summary judgment and we are not bound by the trial court's stated reasons or rationales. [Citation.] [¶] In reviewing a motion for summary judgment, we accept as undisputed fact only those portions of the moving party's evidence that are uncontradicted by the opposing party. In other words, the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn therefrom are accepted as true." (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1001 (*Hersant*).) "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1249-1250.)

"[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon. (See

15.

Evid. Code, § 500.)  There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof….  [A] plaintiff bears the burden of persuasion that 'each element of' the 'cause of action' in question has been 'proved,' and hence that 'there is no defense' thereto.  (Code Civ. Proc., § 437c, subd. (o)(1).)  A defendant bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto.  (*Id*., § 437c, subd. (o)(2).)"  (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 850, fns. omitted.)

"[S]ummary judgment law in this state [no] longer require[s] a defendant moving for summary judgment to conclusively negate an element of the plaintiff's cause of action….  All that the defendant need do is to 'show[] that one or more elements of the cause of action … cannot be established' by the plaintiff.  (Code Civ. Proc., § 437c, subd. (o)(2).)"  (*Aguilar v. Atlantic Richfield Co*., *supra*, at p. 853, fn. omitted.)

## II.      Wade's Wrongful Constructive Discharge Claim Against Starbucks

### A.      *Applicable Legal Framework*

"Employment relationships are generally terminated by resignation or discharge. [Citation.]  An employee voluntarily severs the relationship by resignation; the employer does so by actual discharge."  (*Turner v. Anheuser-Busch, Inc*. (1994) 7 Cal.4th 1238, 1244 (*Turner*).)  "Actual discharge carries significant legal consequences for employers, including possible liability for wrongful discharge.  In an attempt to avoid liability, an employer may refrain from actually firing an employee, preferring instead to engage in conduct causing him or her to quit.  The doctrine of constructive discharge addresses such employer-attempted 'end runs' around wrongful discharge and other claims requiring employer-initiated terminations of employment."  (*Ibid.*)

"Constructive discharge occurs when the employer's conduct effectively forces an employee to resign.  Although the employee may say, 'I quit,' the employment

16.

relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation." (*Turner*, *supra*, 7 Cal.4th at pp. 1244-1245.) "Under the cases, an employee cannot simply 'quit and sue,' claiming he or she was constructively discharged. The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." (*Id*. at p. 1246.) " 'There appears to be no disagreement [in the cases] that one of the essential elements of any constructive discharge claim is that the adverse working conditions must be so intolerable that any reasonable employee would resign rather than endure such conditions.' " (*Id*. at p. 1247.)

"The essence of the test is whether, under all the circumstances, the working conditions are so unusually adverse that a reasonable employee in plaintiff's position ' " 'would have felt compelled to resign.' " ' " (*Turner*, *supra*, 7 Cal.4th at pp. 1247, 1248 ["[T]he cases are in agreement that the standard by which a constructive discharge is determined is an objective one—the question is 'whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit.' "].) Finally, "[a] constructive discharge is the practical and legal equivalent of a dismissal—the employee's resignation must be *employer*-coerced, not caused by the voluntary action of the employee or by conditions or matters beyond the employer's reasonable control." (*Id*. at pp. 1248, 1250 ["a wrongful discharge claim may prevail only if an employee can show the employer, or those representing the employer, either created or knowingly permitted working conditions to remain intolerable"].)

Our Supreme Court summed up the law of constructive discharge as follows: "In order to establish a constructive discharge, an employee must plead and prove, by the

usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign. [¶] For purposes of this standard, the requisite knowledge or intent must exist on the part of either the employer or those persons who effectively represent the employer, i.e., its officers, directors, managing agents, or supervisory employees." (*Turner*, *supra*, 7 Cal.4th at p. 1251.) Our Supreme Court further held: "Standing alone, constructive discharge is neither a tort nor a breach of contract, but a doctrine that transforms what is ostensibly a resignation into a firing. Even after establishing *constructive* discharge, an employee must independently prove a breach of contract or tort in connection with employment termination in order to obtain damages for *wrongful discharge*." (*Ibid.*)

### B. Background: Trial Court's Ruling

The trial court found there was no triable issue of material fact as to Wade's wrongful constructive termination claim and granted Starbucks's motion for summary judgment as to that claim. The trial court stated:

> "When asked why she resigned, plaintiff said: (1) she was not able to meet with Tatiana [S.]; (2) [Joy] ignored company policy on several issues (none relating to plaintiff's alleged mistreatment regarding her gender identity); (3) plaintiff had accumulated stress that resulted from her recovery from facial feminization surgery; and (4) [Joy] brushed off concerns brought to her attention by employees (again, none relating to plaintiff's alleged mistreatment). Plaintiff did not resign due to any mistreatment by coworkers at her new store. Rather, plaintiff disagreed with how [Joy] ran her store and felt she could not work in such an environment.
>
> "As stated in *Turner*[, *supra*, 7 Cal.4th 1238], constructive discharge occurs when working conditions were so intolerable or aggravated 'at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign.' ([*Id.*] at [p.] 1251.) Certainly[,] the history of what plaintiff experienced over time has an impact and is relevant. But, in this case, Guthrie is the only person plaintiff alleges to have mistreated her in

18.

any way.  Starbucks honored plaintiff's request to be removed from Guthrie in granting her request to transfer to [Joy's] store.  Plaintiff left Guthrie and his store March 11, 2018.  Plaintiff was then on leave for eight weeks, and returned to work at a new location, free of Guthrie.  Plaintiff resigned three weeks later after experiencing difficulties with the way the Barstow location was managed.  Accordingly, about 11 weeks went by between plaintiff's successful removal of herself from the one person who purportedly discriminated against her and her decision to end her employment with Starbucks.  Plaintiff fails [to] raise a triable issue as to whether her working conditions were so intolerable 'at the time of [her] resignation that [she] would be compelled to resign.'  ([*Id.*] at p. 1251.)

"Moreover, an employee's 'resignation must be employer-caused[;]' thus, the employer 'must know about [the intolerable working conditions] and fail to remedy the situation in order to force the employee to resign.' ([*Turner*, *supra*, 7 Cal.4th] at pp. 1249-1250.)  To the extent that the working conditions under Guthrie were intolerable, Starbucks remedied the situation by granting plaintiff's request to transfer.  Eleven weeks passed between the last time plaintiff worked under Guthrie and her abrupt resignation.

"Additionally, the evidence shows that the conditions at Guthrie's store were not so intolerable.  There was testimony of some 'leering' and intimidating behavior by Guthrie, but this was directed at all employees, not just plaintiff.  Plaintiff's main problem with Guthrie was his failure to use the proper pronouns based on plaintiff's gender identity.  While plaintiff did ask Guthrie and other employe[e]s to call her Maddie and refrain from using male pronouns, plaintiff herself describes an equivocal request.  She testified, 'I left it open-ended because I don't want to make anybody feel like I'm trying to force them to call me something.  So I asked that, respectfully, I be called Maddie, if that's okay.  If not, no big deal.  If you would just refrain from calling me Matt and male pronouns.' [Citation.]  As plaintiff describes the request, the court cannot conclude that this was a request that, if not honored, would result in an intolerable or hostile work environment.  [¶] … [¶]

"Finally, plaintiff's communications during her transitioning period, during which she was allegedly harassed by Guthrie, indicate that the atmosphere was not intolerable.  On January 25, 2018, co-worker Zaire [D.] texted Guthrie in a group text, 'Dustin your [*sic*] awesome!  Nobody's perfect but all you can do is try.  No other team I rather be on!  Thank you Dustin for all your hard work and being there for us all.'  Plaintiff replied, 'agreed, I finally got a chance to sit down and read this.  Thanks Dustin you are awesome.  I'm happy to be a part of this team as well.  I have never

19.

seen a store on par with what we have here.'  [Citation].  Plaintiff's own words show that Guthrie's workplace conduct was not intolerable."

*C.      Analysis*

Wade contends the trial court erred in granting summary judgment as to her wrongful constructive discharge claim because there are triable issues of material fact with respect to this claim.  We conclude no rational fact finder could find that, under all the circumstances, Wade's working conditions at Starbucks were "so intolerable or aggravated at the time of [her] resignation" that "a reasonable person in [her] position would be compelled to resign."  (*Turner*, *supra*, 7 Cal.4th at p. 1251.)  Accordingly, we affirm the trial court's disposition as to Wade's wrongful constructive discharge claim.

In light of the record, it is undisputed that Wade testified the only Starbucks employee who "actually mistreat[ed]" her during her employment was Guthrie.  Further, it is undisputed that Wade requested and was granted a transfer to a different Starbucks store than the one managed by Guthrie; was permitted to take an eight-week leave during which she underwent facial feminization surgery; and thereafter returned to work at the new Starbucks store (one not managed by Guthrie).  Wade admittedly did not experience any alleged harassment by the manager or employees at the new store (albeit she was unhappy with the management style of her new store manager, Joy G., and had various complaints about her in that context).  Thus, during approximately the last three months of her employment, Wade did not work with the one person who allegedly mistreated her.  Indeed, Wade explained she resigned due to disagreements regarding how her new store manager operated the store and because she was unable to promptly meet with the new district manager to discuss Guthrie's alleged misconduct.  Joy, the manager of the store to which Wade transferred, had been supportive of Wade in their discussions regarding Wade's transfer and, once Wade returned to work, reached out to the district manager on Wade's behalf.  The district manager, in turn, promptly made an initial contact with

20.

Wade but a meeting had not yet been scheduled. In the meantime, there was no prospect Wade would be required to interact with Guthrie in the workplace ever again.

Here, "under all the circumstances," Wade's working conditions were not so intolerable "at the time of [her] resignation" that a reasonable person in her position would be compelled to resign. (*Turner*, *supra*, 7 Cal.4th at pp. 1247, 1248, 1251.) Since no reasonable finder of fact could so conclude, there was no triable controversy as to whether Wade was constructively discharged and, in turn, the trial court properly granted summary judgment as to Wade's wrongful constructive discharge claim. We are not persuaded to the contrary by Wade's contentions on appeal.

## III. Wade's Discrimination Claim Against Starbucks

### A. Applicable Legal Framework

FEHA prohibits discrimination in compensation or in terms, conditions, or privileges of employment because of "race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or veteran and military status." (Gov. Code, § 12940, subd. (a); *McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 979 (*McCaskey*) ["FEHA makes it unlawful to take adverse action toward an employee 'because of' his or her membership in a protected classification."]; *Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1748 ["An employer will be liable for intentional discrimination if it is shown that its employment decision was premised upon an illegitimate criterion."].) "A claim asserting a violation of this provision is a 'disparate treatment' claim." (*McCaskey*, *supra*, at p. 979.) The elements of such a claim have been identified as " '(1) the employee's membership in a classification protected by the statute; (2) discriminatory animus on the part of the employer toward members of that classification; (3) an action by the employer adverse to the employee's interests; (4) a causal link between the

discriminatory animus and the adverse action; (5) damage to the employee; and (6) a causal link between the adverse action and the damage.' " (*Ibid.*)

In many disparate treatment cases, especially those where the employer seeks summary judgment, the primary elements in serious contention tend to be "the existence of discriminatory animus and a causal link between it and the challenged action." (*McCaskey*, *supra*, 189 Cal.App.4th at p. 979.) "Proof of these elements 'is likely to depend on circumstantial evidence, since they consist of subjective matters only the employer can directly know, i.e., his attitude toward the plaintiff and his reasons for taking a particular adverse action." (*Ibid.*) As discussed below, the courts have therefore fashioned special rules for adjudicating employment discrimination claims both at trial and in the context of summary judgment.

### 1.   Standards Applicable to Discrimination Claims at Trial

"Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).) " 'California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of [employment] discrimination….' [Citation.] [¶] 'This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained.' " (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 159 (*Wills*); see *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792; see also *Mixon v. Fair Employment & Housing Com.* (1987) 192 Cal.App.3d 1306, 1317 ["In most cases, the complainant will be unable to produce direct evidence of the employer's intent. Consequently certain rules regarding the allocation of burdens and order of presentation

of proof have developed in order to achieve a fair determination of 'the elusive factual question of intentional discrimination.' "].)

"At trial, the *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination." (*Guz, supra*, 24 Cal.4th at pp. 354-355.) "The elements of a prima facie case of unlawful discrimination vary depending upon the facts." (*Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1038 (*Cucuzza*); *McCaskey, supra*, 189 Cal.App.4th at p. 979 [components of prima facie case of discrimination "vary with the nature of the claim"].) Generally, the plaintiff can meet his or her burden of establishing a prima facie case of discrimination by presenting evidence that demonstrates, even circumstantially or by inference, that (1) he or she belongs to the relevant protected classes or was perceived as belonging to them; (2) he or she was performing his or her job satisfactorily; (3) he or she suffered an adverse employment action such as termination; and (4) there was a causal connection between the adverse action and his or her protected classifications. (*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 235 (*Moore*); *Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 254; *Guz, supra*, 24 Cal.4th at p. 355 [a prima facie case typically requires evidence establishing that "(1) [the plaintiff] was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive"].)

To establish a prima facie case, a plaintiff must show " ' " 'actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a [prohibited] discriminatory criterion." ' " ' " (*Reid v. Google, Inc*. (2010) 50 Cal.4th 512, 520, fn. 2.) The prima facie burden is light; the evidentiary requirements are not onerous. (*Moore, supra*, 248

Cal.App.4th at p. 235.)  "Generally, an employee need offer only sufficient circumstantial evidence to give rise to a reasonable inference of discrimination."  (*Ibid*.)

"If, at trial, the plaintiff establishes a prima facie case, a presumption of discrimination arises," which, if not answered by the employer, is mandatory—it requires judgment for the plaintiff.  (*Guz, supra*, 24 Cal.4th at p. 355.)  "Accordingly, at this trial stage, the burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to 'raise[ ] a genuine issue of fact' and to 'justify a judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason."  (*Id*. at pp. 355-356.)  "[T]he employer may dispel the presumption merely by articulating a legitimate, nondiscriminatory reason for the challenged action."  (*McCaskey, supra*, 189 Cal.App.4th at p. 980; *Wills, supra*, 195 Cal.App.4th at p. 159 [burden on employer to articulate a legitimate, nondiscriminatory reason for its employment decision is not onerous and is generally met by presenting admissible evidence showing the reason for its decision].)

Should the employer sustain this burden and the presumption of discrimination disappear, the plaintiff must meet his or her "ultimate obligation" of proving that the reason for the adverse action was intentional discrimination.  (*Hersant, supra*, 57 Cal.App.4th at p. 1003 [an employee alleging discrimination must ultimately prove that the adverse employment action was taken based on his or her protected status]; *Guz, supra*, 24 Cal.4th at p. 356.)  Thus, the plaintiff is then given "the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive.  [Citations.]  In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias."  (*Guz, supra*, at p. 356; *Wills, supra*, 195 Cal.App.4th at p. 160 ["The plaintiff may satisfy this burden by proving the legitimate reasons offered by the defendant were false, creating an inference that those reasons served as a pretext for discrimination."].)  The "ultimate issue is decided on all the

evidence" (*Hersant, supra*, at p. 1003), and "[t]he ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff." (*Guz, supra*, at p. 356.)

### 2. Summary Judgment in the Context of a Discrimination Claim

The "system of shifting burdens" encompassed by the *McDonnell Douglas* test that is applied in discrimination cases, "necessarily establishes the basic framework for reviewing motions for summary judgment in such cases." (*Hersant, supra*, 57 Cal.App.4th at p. 1002.)

"A [defendant employer's] summary judgment motion ' "slightly modifies the order of [the *McDonnell Douglas*] showings." ' [Citation.] Consequently, [the defendant has] the initial burden to either (1) negate an essential element of [the plaintiff's] prima facie case [citation] or (2) establish a legitimate, nondiscriminatory reason for [the adverse employment action]." (*Wills, supra*, 195 Cal.App.4th at p. 160.)

" '[T]o avoid summary judgment [once the employer makes the foregoing showing], an employee claiming discrimination must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer *acted with* a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.' [Citation.] [¶] 'As several federal courts have stated: "The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." ' " (*Wills, supra*, 195 Cal.App.4th at p. 160, italics added.)

The requisite analysis was summed up in *Moore, supra*, 248 Cal.App.4th at page 236, as follows: " ' " 'In [summary judgment motion] proceedings, the trial court will be called upon to decide if the plaintiff has met his or her burden of establishing a prima facie case of unlawful discrimination. If the employer presents admissible evidence either that one or more of plaintiff's prima facie elements is lacking, or that the adverse

25.

employment action was based on legitimate, nondiscriminatory factors, the employer will be entitled to summary judgment *unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing.* In short, by applying *McDonnell Douglas*'s shifting burdens of production in the context of a motion for summary judgment, "the judge [will] determine whether the litigants have created an issue of fact to be decided by the jury." ' … Thus, ' "[a]lthough the burden of proof in a [discrimination] action claiming an unjustifiable [adverse employment action] ultimately rests with plaintiff …, in the case of a motion for summary judgment or summary issue adjudication, *the burden rests with the moving party to negate the plaintiff's right to prevail on a particular issue*…. In other words, the burden is reversed in the case of a summary issue adjudication or summary judgment motion." ' " ' "

"  'Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. These include *the strength of the plaintiff's prima facie case*, *the probative value of the proof that the employer's explanation is false*, *and any other evidence that supports the employer's case*.' " (*Guz*, *supra*, 24 Cal.4th at p. 362, italics added.)

"In order to raise an issue as to the employer's credibility, the employee must set forth specific facts demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence." ' " (*Cucuzza*, *supra*, 104 Cal.App.4th at p. 1038.) " '[S]peculation cannot be regarded as substantial responsive evidence.' " (*Ibid.*; *Kerr v. Rose* (1990) 216 Cal.App.3d 1551, 1564 [a plaintiff's " 'suspicions of improper motives … primarily based on conjecture and speculation' " are clearly not sufficient to raise a triable issue of fact to withstand summary judgment].)

"In discrimination cases, proof of the employer's reasons for an adverse action often depends on inferences rather than on direct evidence. 'An inference is a deduction

of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.' (Evid. Code, § 600, subd. (b).) Thus, even though we may expect a plaintiff to rely on inferences rather than direct evidence to create a factual dispute on the question of motive, a material triable controversy is not established unless the inference is reasonable. *And an inference is reasonable if, and only if, it implies the unlawful motive is more likely than defendant's proffered explanation.*" (*Cucuzza*, *supra*, 104 Cal.App.4th at p. 1038, italics added.) The temporal proximity of the adverse action, by itself, does not create a triable issue of fact as to whether the employer's articulated reason was pretextual. (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1112.) "If plaintiff fails to produce substantial responsive evidence to demonstrate a material triable controversy, summary judgment is properly granted." (*Cucuzza*, *supra*, 104 Cal.App.4th at p. 1039.)

### B.     Background:  Trial Court's Ruling

The trial court found there was no triable issue of material fact as to Wade's claim that she suffered an adverse employment action because of her gender identity and granted Starbucks's motion for summary judgment as to that claim. The trial court stated:

> "Plaintiff's second cause of action is for discrimination on the basis of sex, gender, gender identity, and/or gender expression in violation of Government Code section 12940, subdivision (a). Plaintiff must establish that (1) she belongs to the relevant protected classes or was perceived as belonging to them; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action such as termination, demotion, or denial of an available job; and (4) there is a causal connection between the adverse action and her protected classifications. (*Guz*[, *supra*,] 24 Cal.4th [at pp.] 354-356.)

> "In employment discrimination claims, '[t]he burden-shifting system requires the employee first establish a prima facie case of … discrimination. If the employee does so, the employer is required to offer a legitimate non-[discriminatory] reason for the adverse employment action.

27.

If it does not, then the employee prevails.'  (*Hersant*[, *supra*,] 57 Cal.App.4th [at p.] 1002.)

"Starbucks contests the third and fourth elements.  Starbucks contends that the only adverse employment action asserted by plaintiff is her constructive discharge.  As addressed above, there was no constructive discharge.  Plaintiff's opposition does not directly argue that there was any other adverse employment action.

"There is mention, however, of reduction in working hours and elimination of plaintiff from a training program [or assessment].  Neither party addresses whether this constitutes an adverse employment action.  Regarding the training program, plaintiff does not present clear evidence on this point.  It was apparently a goal of [plaintiff] to train for an assistant manager position, and there may have been some discussion about it with Guthrie, but 'Guthrie never contacted [plaintiff] again about the Assistant Manager training program.'  [Citation.]  Without more information about this program, the court cannot find a triable issue as to an adverse employment action.  Was it a formal program?  Was plaintiff required to apply for it?  Did plaintiff apply or even explicitly request to participate in it?  It seems that it simply was something that was in contemplation at one point, but that over the course of a few weeks nothing happened with it.  Plaintiff does not show that there was any actual employment action in this regard.

"The evidence is vague regarding the reduction in hours, as well.  Guthrie testified that all employees' hours were reduced due to a slow-down, apparently after the 2017 year-end holidays.  The moving papers provide no documentary evidence of plaintiff's hours in comparison to the hours of other employees, but there is also no objection to Guthrie's testimony.

"The opposition is supported by a declaration from plaintiff, in which she states that her hours were reduced from about 38 hours per week to as little as 23.5 hours in a week.  But she says nothing of whether other employees' hours were reduced, as well.  The opposition also references deposition testimony from two co-workers on the issue of hours reduction.  Zaire [D.] testified that, at some unspecified point, plaintiff's hours were cut, but nobody else's hours were cut.  Zaire [D.] stated he knew her hours were cut because he saw everybody's schedule.  Rachel [S.] testified that plaintiff's hours were cut (she did not say to what extent), which she knew because she saw everyone's schedule.  But Rachel [S.] said nothing about other employees' hours.

28.

"The evidence on whether only plaintiff's hours were cut is vague and unsupported by clear documentary evidence. But, inasmuch as there are no objections, the court concludes that plaintiff has presented evidence that only her hours were cut. However, there still is no clear evidence as to the extent of the reduction in hours or how long it lasted. Moreover, there must be a causal connection between the adverse action and plaintiff's protected classification. (*Guz*, *supra*, 24 Cal.4th at pp. 354-356.) Plaintiff offers only speculation that her hours were reduced because of her gender identity. Such speculation is insufficient to establish a prima facie case of [discrimination]. (See *Salazar v. Upland Police Dept.* (2004) 116 Cal.App.4th 934, 941 ['An assertion … based solely on conjecture and speculation is insufficient to avoid summary judgment.'].) Plaintiff does present evidence of multiple anti-trans social media posts by Guthrie. [Citation.] However, Guthrie never made any anti-trans or negative comments about plaintiff or her transition, in or out of work. [Citation.] Plaintiff was not aware of Guthrie's social media posts until *after* plaintiff's employment with Starbucks ended. [Citation.] Guthrie's posts were not connected to his employment in any way. (See Gov. Code, § 12940(j)(1)); *Myers v. Trendwest Resorts, Inc.* (2007) 148 Cal.App.4th 1403 [there is no liability where alleged incidents of harassment took place outside workplace and [were] not related to employer's interests].) Accordingly, it is entirely speculative that there was any causal connection between the reduction in hours and plaintiff's gender identity.

"Thus, the motion is granted as to the second cause of action."

### C.    *Analysis*

We affirm the trial court's conclusion that there is no triable issue of material fact as to Wade's discrimination claim and that summary judgment is therefore proper as to this claim; our analysis, however, differs from that of the trial court.

Wade's *entire* argument, in her opposition to Starbucks's motion for summary judgment as to Wade's discrimination claim, was two sentences long: "Starbucks'[s] summary judgment argument as to Plaintiff's cause of action for discrimination is based on the same faulty premise that the Court should ignore everything that Plaintiff was subjected to prior to her transfer to the Barstow Location. [Citation.] And, for the same reason discussed above, the motion should be denied as there is a triable issue issued [*sic*] based on the accumulation of incidents and events, not just those at the Barstow

29.

Location."  At oral argument, Wade's counsel conceded that the *McDonnell Douglas* burden-shifting test was the controlling standard for resolving Starbucks's motion as to Wade's discrimination claim.

Wade now argues, for the first time on appeal, that the *McDonnell Douglas* test is not applicable because there is direct evidence of discrimination in the record.  (See *Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1144-1145 (*Trop*) [*McDonnell Douglas* burden-shifting test applies in discrimination cases except in the rare instance where there is direct evidence of discriminatory motive]; *DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 550 [" ' "*McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination" ' "] (*DeJung*); see Title VII and the California Fair Employment and Housing Act, Cal. Practice Guide Employment Litigation, Ch. 7-A, § 452 ["If the direct evidence of a biased motivation is 'substantial,' plaintiffs can establish a prima facie case without proceeding under the *McDonnell Douglas* burden-shifting analysis."]; *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67-68 (*Morgan*) ["Where a plaintiff offers direct evidence of discrimination that is believed by the trier of fact, the defendant can avoid liability only by proving the plaintiff would have been subjected to the same employment decision without reference to the unlawful factor."].)

Wade has waived the argument that the *McDonnell Douglas* test is inapplicable, and, in any event, as discussed below, there is no direct evidence of discrimination in the record.  (See *American Continental Ins. Co. v. C. & Z Timber Co.* (1987) 195 Cal.App.3d 1271, 1281 ["[P]ossible theories that were not fully developed or factually presented to the trial court cannot create a 'triable issue' on appeal."]; *Ernst v. Searle* (1933) 218 Cal. 233, 240-241 ["A party is not permitted to change his position and adopt a new and different theory on appeal.  To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant."].)  We will therefore analyze

Starbucks's motion for summary judgment as to Wade's discrimination claim with reference to the *McDonnell Douglas* test.

As noted above, to prevail on a disparate treatment claim at trial, the plaintiff has the burden of establishing a prima facie case of discrimination: "he or she was a member of a protected class; was qualified for the position he sought [or was performing competently in the position held]; suffered an adverse employment action, and there were circumstances suggesting that the employer acted with a discriminatory motive." (*Jones v. Department of Corrections and Rehabilitation* (2007) 152 Cal.App.4th 1367, 1379-1380.) In a defense motion for summary judgment, the defendant must show the plaintiff cannot establish one of these elements or that there were one or more legitimate, nondiscriminatory reasons underlying the adverse employment action.

Here, there is no dispute that plaintiff, on account of her transgender status, was a member of a protected class and that she was performing satisfactorily in her position in Guthrie's store. Starbucks contested only whether Wade suffered any adverse employment action and whether any such action was motivated by Wade's gender identity.

As to the element requiring an adverse employment action, as discussed above, wrongful constructive discharge is not at issue here. Wade contends she was not provided an opportunity to take an assessment or participate in a training program for an assistant manager position, and argues, for the first time on appeal, that this constitutes an adverse employment action. There is only vague and conclusory evidence on this point. As explained in the trial court's ruling, without more information about the assessment or ostensible training program and Wade's qualifications for it, there is no triable issue as to an adverse employment action in this context—it cannot be established that there was an official employment action whereby Wade was actually denied a promotional opportunity.

31.

Wade also posits, for the first time on appeal, that the fact that, approximately two months after Wade informed Guthrie she was transitioning, Guthrie reduced the number of hours per week that Wade worked at the store, constitutes an adverse employment action. In light of Starbucks's limited treatment of this issue, we will assume, without deciding, that the reduction of Wade's hours was an adverse employment action. However, we agree with the trial court that the testimonial evidence regarding the reduction in Wade's weekly working hours is vague and unsupported by documentary evidence. Wade testified her hours began to be reduced towards the end of 2017 but said nothing as to whether the hours of other employees were also reduced. Although two of Wade's coworkers, Zaire D. and Rachel S., testified that Wade's hours were cut, they did not specify the extent of the reduction, when the reduction occurred, whether it was consistent over a period of time, what period was at issue, or the length of the period at issue. As to whether the hours of other workers were also cut during the applicable, if unspecified, timeframe, Zaire indicated the hours of other workers were not cut. But, as to the basis for this conclusion, Zaire stated, "[W]hen you work there, you just know. Like, you know."

In this case, the question whether summary judgment was properly granted on Wade's discrimination claim may be resolved by examining whether Wade sufficiently raised triable issues of fact to dispute Starbucks's asserted legitimate, nondiscriminatory reason for reducing her hours. It is not necessary for us to address whether Wade stated a prima facie claim to the effect that Guthrie had a discriminatory motive, related to her protected status, for reducing her hours. Even assuming Wade made the required prima facie showing as to this claim, for Wade to survive summary judgment and ultimately prevail on this claim, she would have to raise triable issues of material fact and later prove that the purportedly legitimate reason for the reduction in her hours was merely pretextual. We conclude she failed to raise a triable issue of fact material to Starbucks's

32.

showing, and Starbucks's summary judgment motion was properly granted as to this claim.

As stated above, to avoid summary judgment, an employee must offer substantial evidence that the employer's stated legitimate reason for the adverse employment action was false, or evidence that the employer acted with a discriminatory animus, or a combination of these, such that a reasonable trier of fact could conclude, under the governing standard of proof, that the employer engaged in prohibited conduct. (See *Hersant*, *supra*, 57 Cal.App.4th at pp. 1004-1005.) Starbucks met its initial burden of producing substantial evidence of a legitimate, nondiscriminatory reason for reducing Wade's hours. Guthrie testified: "I did my best to schedule [Wade] as many hours as I possibly could. There is always a fluctuation in business." Guthrie also explained that Wade's hours were reduced on account of a business slowdown as the holiday season wound down. Guthrie testified that the hours of other employees, including the other shift supervisors, also went down at that time. Wade has not produced specific evidence to undercut or contradict Guthrie's testimony that the hours of other workers were reduced contemporaneously or in fairly close temporal proximity with the reduction in Wade's hours. While Zaire D. indicated that the hours of other workers did not go down, his statement is very general, lacks relevant details, and is completely nonspecific as to the timeframe applicable to his testimony (the latter lapse is additionally significant because, after Wade began her transition, she periodically took time off in connection with her transition and there was no indication Zaire had accounted for those periods). Moreover, the stated basis for Zaire's statement that other workers' hours were not cut was essentially that he "just kn[e]w," vitiating its probative value.

Since Starbucks presented a legitimate reason for the reduction in Wade's hours, that is, fluctuation in business, "[a]t that point the presumption of unlawful discrimination 'simply drops out of the picture.' [Citation.] [¶] Consequently, the burden shifted to [Wade] to 'produce "substantial responsive evidence" that the employer's showing was

33.

untrue or pretextual. [Citation.]' [Citations.] 'To avoid summary judgment, [the plaintiff] "must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses." [Citation.] [He] must produce "specific, substantial evidence of pretext." [Citation.]' [Citation.] We emphasize that an issue of fact can only be created by a conflict of evidence. It is not created by speculation or conjecture." (*Horn v. Cushman & Wakefield Western, Inc*. (1999) 72 Cal.App.4th 798, 807.)

As to whether Guthrie's stated reasons for reducing Wade's weekly working hours masked an illegal motive, Wade contends there was direct and circumstantial evidence to show that Guthrie acted with discriminatory intent in reducing her hours, which evidence renders his stated reasons pretextual. (See *DeJung*, *supra*, 169 Cal.App.4th at p. 553 [a plaintiff may establish pretext by presenting direct evidence to show that a discriminatory reason more likely motivated the employer or by presenting indirect evidence to show that the employer's proffered explanation is unworthy of credence].)

Wade argues evidence of Guthrie's social media posts that spanned several years and included memes that were disparaging of transgender persons and transgender issues constitutes *direct* evidence that Guthrie acted with a discriminatory motive. (See *Godwin v. Hunt Wesson, Inc*. (9th Cir. 1998) 150 F.3d 1217, 1221 ["When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created *even if the evidence is not substantial.*"].) We reject the contention that evidence of Guthrie's social media posts constitutes direct evidence of discriminatory motive. (*Trop*, *supra*, 129 Cal.App.4th at p. 1145 ["Direct evidence is evidence which proves a fact without inference or presumption."].) Guthrie's social media posts related to his personal life, that is, time when he was off work; did not concern or refer to any Starbucks employee; and did not implicate or contain any reference to the workplace. Wade testified that Guthrie never made any disparaging comments regarding transgender persons or transgender issues, at work; nor was Wade aware of any negative comments made by Guthrie about her transition or gender identity.

34.

Wade was the first transgender person Guthrie was aware of ever meeting and he told her he wanted to support her as best as he could during her transition. The social media posts do not *directly* show that Guthrie acted with discriminatory motive in cutting Wade's hours. (*DeJung*, *supra*, 169 Cal.App.4th at p. 550 ["Comments demonstrating discriminatory animus may be found to be direct evidence if there is evidence of a causal relationship between the comments and the adverse job action at issue."].)

Furthermore, to the extent the social media posts constitute circumstantial evidence of discriminatory motive, and, in turn, pretext, they amount to relatively weak circumstantial evidence as they were made outside the workplace and did not reference or relate to the workplace in any way. (See *Morgan*, *supra*, 88 Cal.App.4th at p. 69 ["Circumstantial evidence of ' "pretense" must be "specific" and "substantial" in order to create a triable issue with respect to whether the employer intended to discriminate' on an improper basis."]; *Hersant*, *supra*, 57 Cal.App.4th at pp. 1004-1005; also see, e.g., *Texas Department of Community Affairs v. Burdine* (1981) 450 U.S. 248, 256 [at trial, the burden of establishing pretext can "merge[] with the ultimate burden of persuading [the trier of fact] that [the plaintiff] has been the victim of intentional discrimination"].)

Next, Wade contends that Guthrie's use of the name Matt and male pronouns to refer to Wade, constitutes direct evidence that Guthrie acted with discriminatory motive in reducing Wade's hours. With respect to the issue of the names and pronouns used to refer to Wade, Wade admitted at deposition that her request in this context was equivocal, not explicit. Wade testified she left the issue "open-ended" because she did not "want to make anybody feel like I'm trying to force them to call me something." Wade further testified that if people did *not* call her Maddie, it was "no big deal." She indicated she wanted people to "avoid calling [her] Matt, if possible, and try to avoid male pronouns." Wade broached this issue with Guthrie during their initial conversation about her plans to start transitioning, but thereafter, during the relevant period, Wade continued to wear her "Matt" nametag. The undisputed evidence indicates that Wade did not provide Guthrie

35.

with clear guidance on the issue and other employees also may have been unclear on Wade's preferences, at work, in this regard.

Given the lack of clear guidance, Guthrie's conduct cannot be characterized as an intentional violation of Wade's express and exclusive preferences as to appropriate names and pronouns for her, as she embarked on her transition. *On the specific facts applicable here*, Guthrie's use of the name Matt and male pronouns to refer to Wade was not *direct* evidence that Guthrie reduced Wade's hours because of discriminatory motive; to the extent this evidence constitutes circumstantial evidence of discriminatory motive, *again on the specific facts applicable here*, it amounts to relatively weak circumstantial evidence. (Cf. Cal. Code Regs., tit. 2, § 11034, subd. (h)(3) ["If an employee requests to be identified with a preferred gender, name, and/or pronoun, including gender-neutral pronouns, an employer or other covered entity who fails to abide by the employee's stated preference may be liable under [FEHA]."])

Wade also contends that Guthrie's failure to comply with Starbucks's newly released "best practices" workplace guidelines regarding transgender employees was circumstantial evidence that he reduced Wade's hours on account of a discriminatory motive. Although Guthrie did not follow these "best practices" guidelines, he indicated to Wade he would work with her so she could attend medical and other appointments and Wade regularly took time off for this purpose.[5]

Finally, Wade relies on Guthrie's distant demeanor, "leering," and threats to write up Wade and other employees as circumstantial evidence that Guthrie acted for discriminatory reasons in reducing Wade's hours. However, according to Wade herself, Guthrie gave dirty looks to all employees when he was in a bad mood and threatened to write up multiple employees for various things. In other words, Wade conceded that Guthrie directed much of the conduct she found offensive at multiple employees apart

---

[5]     Wade also took leave of at least six weeks for facial feminization surgery (albeit this leave commenced after her transfer to Joy G.'s store became effective).

from herself (i.e., employees who were not transgender). While Wade testified that Guthrie's demeanor was less friendly after she informed him of her transition, Guthrie bought her a cake and convened a going-away gathering for her at the time of her transfer. Guthrie also invited Wade to a store celebration while Wade was on leave upon transferring; Wade attended the store celebration.

Other relevant evidence showed that Wade texted Guthrie in January 2018, expressing her happiness in being on his team and appreciation for the way the store was run. Wade also contributed to a "thank you" gift for Guthrie and wrote a note describing Guthrie as "hands down the best manager I have ever had an opportunity to work with in my entire Starbucks [career]." Guthrie never took any corrective action against Wade and assured her that he had no concerns about her performance. When Guthrie reduced Wade's hours as the holiday season wound down, he also contemporaneously, or in the same general timeframe, reduced the hours of other workers. Wade noted in her deposition, that sometime around February 2018, her hours went up again, indicating Guthrie adjusted her hours upward after the post-holiday slowdown eased.

Considering all the evidence, we conclude Wade failed to adequately rebut Starbucks's showing that Wade's hours were reduced on account of legitimate business needs. A reasonable fact finder could not find, under the preponderance of the evidence standard of proof, that, in reducing Wade's hours, Guthrie acted with a discriminatory motive. In turn, Starbucks has sustained its burden to show that no triable issue of material fact exists as to Wade's discrimination claim. (*Cucuzza*, *supra*, 104 Cal.App.4th at p. 1039 ["If plaintiff fails to produce substantial responsive evidence to demonstrate a material triable controversy, summary judgment is properly granted."].) Summary judgment is therefore warranted on this claim and we affirm the trial court's ruling granting summary judgment as to this claim.

37.

## IV. Wade's Harassment Claims Against Starbucks and Guthrie

### A. Applicable Legal Framework

FEHA specifically prohibits harassment based on "race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation or veteran or military status." (Gov. Code, § 12940, subd. (j)(1); *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 706-707 ["harassment focuses on situations in which the *social environment* of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee"; harassment "refers to bias that is expressed or communicated through *interpersonal relations* in the workplace"].) Wade's claim of harassment against Starbucks and Guthrie is based on a "hostile work environment" theory, which applies "where the harassment is sufficiently pervasive so as to alter the conditions of employment and create an abusive work environment." (*Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 141 (*Mokler*), overruled on other grounds by (*Lawson v. PPG Architectural Finishes, Inc.* (Jan. 27, 2022, No. S266001) ___Cal.5th___ [2022 Cal. Lexis 312].)

" 'For [hostile work environment harassment] to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment." ' " (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 609 (*Fisher*).) To succeed on a FEHA harassment claim, a plaintiff must prove, among other things, the following elements: (1) she was subjected to verbal or physical conduct of a harassing nature that was based on her protected class; and (2) the conduct was sufficiently severe or pervasive to create an objectively and subjectively hostile work environment. (*Fisher*, *supra*, at pp. 608-609; see Cal. Code Regs., tit. 2, § 11019, subd. (b)(1).) A "hostile work environment" has been described as a workplace " 'permeated with "discriminatory intimidation, ridicule and insult,"

38.

[citation] that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." ' " (*Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511, 517; *Sheffield v. Los Angeles County Dept. of Social Services* (2003) 109 Cal.App.4th 153, 161 [it is " ' " 'clear that conduct must be extreme to amount to a change in the terms and conditions of employment' " ' "].)

" '[T]he existence of a hostile work environment depends upon "the totality of the circumstances." [Citation.]' [Citation.] ' "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ' " (*Fuentes v. AutoZone, Inc.* (2011) 200 Cal.App.4th 1221, 1227 (*AutoZone*).) " '[W]hile an employee need not prove tangible job detriment to establish a [FEHA] harassment claim, the absence of such detriment requires a commensurately higher showing that the sexually harassing conduct was pervasive and destructive of the working environment.' " (*Fisher*, *supra*, 214 Cal.App.3d at p. 610.) "The requirement that the conduct be sufficiently severe or pervasive to create a working environment a reasonable person would find hostile or abusive is a crucial limitation that prevents [FEHA] harassment law from being expanded into a 'general civility code.' " (*Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1377, quoting *Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 81.)

Harassment is actionable under FEHA when there is "a pattern of continuous, pervasive harassment," giving rise to a hostile work environment that is both objectively and subjectively offensive. (*Fisher*, *supra*, 214 Cal.App.3d at p. 611; *AutoZone*, *supra*, 200 Cal.App.4th at p. 1226.) Therefore, "a plaintiff who subjectively perceives the workplace as hostile or abusive will not prevail under the FEHA, if a reasonable person in the plaintiff's position, *considering all the circumstances*, would not share the same

perception." (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 284, italics added.) "Likewise, a plaintiff who does not perceive the workplace as hostile or abusive will not prevail, even if it objectively is so." (*Ibid*.) "Whether an employee was subjected to a hostile work environment is ordinarily [a question] of fact." (*Rehmani v. Superior Court* (2012) 204 Cal.App.4th 945, 959.) "FEHA makes the employer strictly liable for harassment by a supervisor." (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1040-1041.)

### B.      Background:  Trial Court's Ruling

The trial court granted Starbucks's motion for summary judgement as to Wade's harassment claim against Starbucks and Guthrie.  The trial court ruled:

> "The third cause of action, against both Starbucks and Guthrie, is for harassment on the basis of sex, gender, gender identity, and/or gender expression in violation of Government Code section 12940, subdivision [(j)(1)].  Plaintiff must prove that (1) she was subjected to verbal or physical conduct of a harassing nature that was based on her protected class; and (2) the conduct was sufficiently severe or pervasive to create an objectively and subjectively hostile working environment.  (*Fisher*[, *supra*,] 214 Cal.App.3d [at pp.] 608-609.)  To meet the 'severe or pervasive' standard for harassment, plaintiff must demonstrate that her workplace was 'permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'  (*Mokler*[, *supra,*] 157 Cal.App.4th [at p.] 145; *Fisher*, *supra*, 214 Cal.App.3d at p. 609.)

> "Guthrie never made any anti-trans comments or negative comments about plaintiff's transition or gender identity.  [Citation.]  The leering and threats to write-up employees were directed at other non-trans employees, and therefore are not linked to plaintiff's gender identity.  There is no evidence that the reduction in hours related to plaintiff's gender identity.  The cause of action appears primarily based Guthrie's failure to use pronouns corresponding to plaintiff's gender identity, and Guthrie's apparent discomfort with and distance from plaintiff after she revealed her diagnosis and intent to transition to female.

> "Courts in cases involving much more severe conduct have held the conduct not to constitute actionable harassment, including *McCoy v. Pacific Maritime Ass'n* (2013) 216 Cal.App.4th 283, 293-294, where the grant of

summary judgment in favor of the defendant employer was affirmed where the plaintiff's coworkers yelled at the plaintiff and called her stupid, stated a woman had a 'J-Lo ass,' speculated about another employee's sexual relationship, and made crude gestures toward an employee with her back turned. In *Jones v. Department of Corrections and Rehabilitation* (2007) 152 Cal.App.4th 1367, 1377-78, conduct was not severe or pervasive where a female corrections officer was physically assaulted, sent to work in a tool shed because male officers did not want her around, criticized daily, and faced with openly hostile coworkers who spread rumors about her.

"In her deposition, plaintiff would not describe Guthrie's conduct as outrageous, only unprofessional. She did say his conduct was extreme, but only in the sense of using intimidation in situations having nothing to do with plaintiff in particular, or her gender identity. [Citation.] As referenced above, on January 25, 2018, plaintiff wrote " … Dustin you are awesome. I'm happy to be a part of this team as well. I have never seen a store on par with what we have here." [Citation.] Plaintiff's own words show that Guthrie's workplace conduct was not severe or pervasive.

"Plaintiff's opposition argues that Guthrie failed to follow Starbucks'[s] guidelines supporting transgender employees. The guidelines provide that partners should be addressed by the pronoun that corresponds to the partner's gender identity. 'Intentional or persistent refusal to identify the partner by the pronoun of choice may violate Starbucks'[s] *Anti-Harassment Standard*.' [Citation.] However, Starbucks'[s] internal policies do not set the standard for what constitutes harassment under the Fair Employment and Housing Act. Plaintiff must prove [at trial] that she was subjected to <u>verbal or physical conduct</u> of a harassing nature that was based on her protected class, and that the conduct was sufficiently <u>severe or pervasive</u> to create an <u>objectively</u> and subjectively <u>hostile working environment</u>. (*Fisher*[, *supra*,] 214 Cal.App.3d [at pp.] 608-[6]09.) The undisputed material facts show that Guthrie's conduct did not create a subjectively and objectively hostile work environment.

"The motions are therefore granted as to the third cause of action." (Emphasis in original.)

## C.    *Analysis*

Wade argues there are triable issues of fact as to whether Guthrie's conduct violated FEHA's prohibition on workplace harassment on the basis of sex, gender, gender identity, and gender expression. Starbucks contends, in response: "Wade's harassment claim fails because she cannot establish a *prima facie* case of harassment, as the alleged

41.

conduct was not severe or pervasive and did not interfere with her ability to do her job. The trial court properly considered all the evidence before it, and, in doing so, determined there was no triable issue of fact as to Wade's harassment claim." We affirm the trial court.

Wade's harassment claim encompasses, inter alia, the following alleged conduct: (1) Guthrie reduced Wade's weekly working hours; (2) Guthrie gave dirty looks to employees and others, including Wade, on various occasions; (3) Guthrie threatened to write up multiple employees for various things, including Wade and workers on her shift teams; (4) Guthrie interacted with Wade less after she told him about her transition; (5) Guthrie was less warm with Wade after she told him about her transition, and he would look at her in a strange way; (6) Guthrie did not use the correct name and pronouns when referring to Wade; and (7) Guthrie did not follow Starbucks's newly released "best practices" workplace guidelines for supporting transgender employees.

Here, as the trial court noted, much of the conduct of which Wade complains, such as leering and threats to write-up employees, was directed at multiple employees and not just Wade or transgender employees and was therefore not related to Wade's gender identity. Similarly, as discussed above, the evidence does not show that the reduction of Wade's weekly working hours towards the end of 2017 and beginning of 2018 was related to her gender identity.

Wade contends that Guthrie's use of the name Matt and male pronouns to refer to her constitutes unlawful harassment. As discussed above, the undisputed evidence indicates that Wade broached the issue of appropriate names and pronouns with Guthrie ahead of starting her transition and did not provide clear guidance, leaving the issue "open-ended." Wade also continued to wear her "Matt" nametag at work. *On the specific facts applicable here*, given the lack of clear guidance, Guthrie's conduct cannot be characterized as an intentional violation of Wade's express and exclusive preferences as to appropriate names and pronouns for her, as she embarked on her transition. (Cf.

42.

Cal. Code Regs., tit. 2, § 11034, subd. (h)(3) ["If an employee requests to be identified with a preferred gender, name, and/or pronoun, including gender-neutral pronouns, an employer or other covered entity who fails to abide by the employee's stated preference may be liable under [FEHA]."])

At deposition, Wade declined to describe Guthrie's conduct with her as outrageous; she used the term, unprofessional, to describe it. The only conduct on Guthrie's part that Wade considered extreme was related to an incident when Guthrie threatened to write up multiple employees over the placement of a mop bucket in a sink.

Guthrie did not implement Starbucks's "best practices" workplace guidelines with respect to transgender employees. However, Guthrie was supportive when Wade broached the issue of her transition with him and indicated to Wade that he would work with her so she could attend medical and other appointments, and Wade regularly took time off for this purpose. Guthrie also promptly informed the district manager of Wade's transition.

Guthrie never made any disparaging comments about transgender people at work and Wade testified she was not aware of any negative comments by him toward her during her transition. Guthrie never gave Wade any corrective action and repeatedly assured Wade that he had no concerns about her performance at work. Wade enjoyed working with her other coworkers. Wade sent Guthrie a text in January 2018, telling him she was happy to be on his team and that Guthrie was "awesome." On Wade's last day, Guthrie bought a cake and organized a small send-off for Wade. Guthrie also invited Wade to a store celebratory dinner after Wade had transferred to another store and while she was on leave; Wade accepted the invitation and attended the celebration.

Guthrie's conduct did not constitute "a pattern of continuous, pervasive harassment," giving rise to a hostile work environment that is *both* objectively and subjectively offensive. (*Fisher*, *supra*, 214 Cal.App.3d at p. 611.) We conclude there is

43.

no triable issue of material fact as to Wade's harassment claim and the trial court properly granted summary judgment as to this claim.

## V.     Wade's Intentional Infliction of Emotional Distress Claims (IIED) Against Starbucks and Guthrie

### A.     *Applicable Legal Framework*

The elements of an IIED claim are:  " ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." ' "  (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903.)  " 'Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.' "  (*Ibid.*)  As for "severe emotional distress," this means "emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it."  (*Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 396.)

### B.     *Background:  Trial Court's Ruling*

The trial court granted the summary judgment motions of Starbucks and Guthrie as to Wade's claims of IIED.  Applying the above-delineated framework, the trial court ruled:

> "Here, even crediting plaintiff's version of the facts as accurate, there is no evidence of extreme and outrageous conduct.  For the reasons discussed above, the conduct alleged simply does not rise to that level.  Plaintiff's oppositions do not actually address the intentional infliction of emotional distress cause of action, or otherwise attempt to show that the cause of action is viable.

> "Nor is there evidence of severe emotional distress.  Plaintiff's only claim for emotional distress directly relating to Guthrie's conduct is that it caused her anxiety and that she lost confidence and felt she could no longer work in a customer-facing job.  [Citation.]  Anxiety alone is not sufficiently intense or enduring so as to rise to the level of severe emotional distress.

44.

(*Fletcher v. Western National Life Ins. Co*. (1970) 10 Cal.App.3d 376, 397.)  Severe emotional distress means highly unpleasant mental suffering or anguish from socially unacceptable conduct, which entails such intense, enduring and nontrivial emotional distress that 'no reasonable man in a civilized society should be expected to endure it.'  (*Id*. at p. 396.)  [¶] … [¶]

"Accordingly, the motions are granted as to the fourth cause of action."

## C.     Analysis

We conclude there is no triable issue of material fact as to Wade's IIED claims against Starbucks and Guthrie and affirm the trial court's ruling granting the defendants' motions for summary judgment as to these claims.

### DISPOSITION

The judgment is affirmed.  Defendants to recover costs on appeal.

                                                                    SMITH, J.

WE CONCUR:


HILL, P. J.


POOCHIGIAN, J.


45.